## Bowman v. Commonwealth.

(Decided January 30, 1912.)

### Appeal from Marion Circuit Court.

1. Indictment—Demurrer Sustained to—Resubmission to Grand Jury—Relates Back to Date of Original Indictment.—Ordinarily where a demurrer is sustained to an indictment with leave to resubmit, the case it at once presented to the grand jury and a new indictment returned, in which event the indictment so returned relates back to the date upon which the original indictment was returned.

2. Same—When Grand Jury Not In Session When Demurrer is Sustained.—But when the grand jury is in session when the demurrer is sustained, it is left to the court as to whether or not a grand jury shall be summoned for that special purpose or the case passed to the next regular sitting of the grand jury.

3.  Separation of Jury—Provision of Code—Failure of Judge to Keep Together Not Reversible Error.—Section 244, Criminal Code, means that the jury shall not be permitted to separate after they have been accepted by both the Commonwealth and accused, and the failure of the judge to keep them together when they had not been accepted by the accused could not be treated as reversible error.

4.  Rape—Character of Prosecutrix—Evidence.—On the trial for rape, it is admissible to prove the bad character of the woman alleged to have been assaulted, the authorities agreeing that "a woman of bad character would be more apt to give her consent to criminal intimacy than one of good character."

5.  Same—Evidence of Good Character Rebuts Idea of Consent.— Where the accused charges that the act was done with the consent of the prosecuting witness, if it can be shown for her that her reputation for chastity and morality is good, this tends in a degree to rebut the idea that she would consent to such an act.

6.  Same—Evidence.—It is apparent from the evidence that the prosecutrix was an ignorant girl, that her opportunities had been poor, her education neglected and her ideas of propriety far from exalted. The examination of a physician showed evidences of the assault, and the evidence indicates that the accused diabolically set about to accomplish it.

7.  Consent—Provision of Statute—What Constitutes Rape.—The statute does not require that the woman shall either object or resist, but simply provides that if the act is done without her consent and against her will, it is rape. Consent will not be presumed by mere silence, and this is especially true where the prosecutrix has been frightened or terrorized by the accused. It is both unnatural and unreasonable that the prosecutrix should consent. She says she offered no resistance because she was afraid to. Surely, the ends of justice would not require that she should be beaten into submission or choked into silence before she could claim that she was an unwilling victim of accused's lust.

8.  Province of Jury.—It is peculiarly the province of the jury to determine the question of guilt or innocence of the defendant, and there being abundant evidence to support the finding of the jury, the judgment must be affirmed.

S. A. RUSSELL, BEN SPALDING for appellant.

H. S. McELROY, C. S. HILL, C. H. MORRIS, Assistant Attorney General, JAMES GARNETT, Attorney General for appellee.

Opinion of the Court by Judge Lassing—Affirming.

John Bowman and Clarence Alford were jointly indicted by the grand jury of Marion County at its April term, 1911. In said indictment they were charged with having committed the crime of rape upon one Minnie

Lamb on February 26th, 1911. A special term of the Marion Circuit Court was called for June 13th, 1911, to try this case. The trial was entered upon, a jury procured and sworn, but before any evidence was heard a general demurrer was filed to the indictment, and said demurrer was sustained, with leave to re-submit the case to the grand jury. No grand jury was in session at that time; but at the following September term of said court the case was again submitted to the grand jury, with the result that an indictment was again returned against said parties charging them with the crime of rape. When the case was called for trial on October 16th, 1911, Bowman demanded, and was given, a separate trial. The jury found him guilty as charged and fixed his punishment at death. He seeks a reversal of the judgment predicated upon that verdict upon several grounds.

First, it is insisted that the court erred to his prejudice in directing the sheriff to summon a hundred men from Boyle county after the regular panel and all the names remaining in the jury wheel had been exhausted.

Section 194 of the Criminal Code provides that:

"If the judge of the court be satisfied, after having made a fair effort, in good faith, for that purpose, that, from any cause, it will be impracticable to obtain a jury free of bias in the county wherein the prosecution is pending, he shall be authorized to order the sheriff to summon a sufficient number of qualified jurors from some adjoining county in which the judge shall believe there is the greatest probability of obtaining impartial jurors, and from those so summoned the jury may be formed."

In Roberts v. Commonwealth, 94 Ky., 499, this court said, in construing this section of the Code:

"The manner of satisfying himself of this impracticability is by making a fair effort to obtain the jury in the county wherein the case is pending."

In Moseley v. Commonwealth, 27 Rep., 214, where the action of the trial judge in sending into an adjoining county for a jury was attacked as prejudicial error, because he had not in good faith first attempted to obtain an impartial jury in the county where the case was tried, it is said:

"We will conclusively presume, in the absence of anything in the record to the contrary, that the court followed the law in selecting the jury."

And in Brafford v. Commonwealth, 13 Rep., 154,

where it appeared that there had been three trials of the case in the same county, it was held that the court was authorized to send to an adjoining county for the fourth jury without making any effort to obtain it in the county where the trial was pending after having exhausted the regular panel.

In the bill of evidence the judge states that "at the time, from previous efforts made to get a jury in this county and the great number of men examined for that purpose,. he was satisfied it would be impossible to get a jury in this county." This statement of the judge, of the effort previously made to get a jury, referred to the trial which was attempted to be had at the special June term. It is conceded by counsel for appellant that, after the panel for the regular September term had been drawn there remained but twenty-eight names in the jury wheel, and that, from the panel drawn for the regular September term and the twenty-eight jurors whose names were thereafter drawn from the wheel, a jury could not be obtained. The law imposes upon the trial judge the duty of making an honest effort to secure the jury in the county where the trial is being held before he can send into another county for a jury. In the absence of the foregoing statement from the bill of evidence it would appear that the judge had abused his discretion in this particular; but his statement shows, that because of the trouble experienced in getting a jury in this case at the special June term, he did not believe one could be procured in that county. Under these circumstances, his sending into an adjoining county for a jury was not error.

It is next insisted that, when these twenty-eight remaining names in the jury wheel were drawn, they should have been placed in a hat and drawn therefrom, as in other cases. If the jury had been made up and these twenty-eight names not exhausted, there might be room for complaint on this score. But inasmuch as all of the twenty-eight names were called, appellant was in no wise prejudiced on this account. It appears that the court proceeded in the way in which he did for the reason that the sheriff had returned into court the names of the twenty-eight jurors summoned from Marion County together with the venire summoned from Boyle County. The court desired that the venire summoned from Marion County should be first exhausted, and hence they were called in the order as summoned by the sher-

iff rather than drawn from the hat. We fail to see wherein this afforded appellant any just ground of complaint.

The second ground relied upon for reversal is the failure of the court to grant appellant a continuance because of the absence of certain witnesses. The affidavit filed in support of this motion for a continuance set forth what the absent witnesses, if present, would say. The motion for a continuance was overruled, but the court permitted the affidavit of what the witnesses would say, if present, to be read to the jury as the deposition of these absent witnesses. It is urged most earnestly for appellant that the court erred to his prejudice in not requiring the Commonwealth's Attorney to admit as true the statements in this affidavit as to what the absent witnesses, if present, would say. This contention is based upon the idea that the appellant was being tried at the same term at which the indictment was returned. The original indictment was returned at the April term of court. A demurrer, as stated, was sustained thereto at the special June term, at which time there was no grand jury in session. But leave was given the Commonwealth's Attorney to re-submit the case to the September grand jury. This was done at the September term. Ordinarily, where a demurrer is sustained to an indictment with leave to re-submit, the case is at once presented to the grand jury and a new indictment returned; in which event, the indictment so returned relates back to the date upon which the original indictment was returned. This point was expressly decided in Smithers, &c. v. Commonwealth, 12 Rep., 636. But the precise question here raised has not heretofore been passed upon. This is, where the case was resubmitted to the grand jury at a term other than that at which the indictment was quashed, is the prosecution nevertheless to be treated as having been begun on the day upon which the original indictment was returned? The authority for again submitting to a grand jury for its consideration the evidence upon which an indictment had theretofore been returned and to which a demurrer had been sustained is section 170 of the Criminal Code, which provides that:

"If the demurrer be sustained on any other grounds than those mentioned in the last four sections, the case may be submitted to another grand jury, and an order to that effect may be made by the court on the record,

whereupon the defendant shall be held in custody, or on bail, in the manner and for the time provided in sections 159 and 160.''

Section 159 defines the method of procedure when an indictment is set aside, and is as follows:

''If the motion be sustained, the court shall make an order that the case be submitted to another grand jury, to be assembled at that or the next term of the court, and the defendant, if in custody, shall be remanded to jail, or if on bail, the bail shall be liable for the defendant's appearance to answer a new indictment, if one be found.''

Section 160 provides:

''Unless, however, a new indictment be found before the final discharge of the next grand jury, the defendant shall be discharged from custody, or bail, unless for good cause shown the court shall otherwise order.''

It would seem that the Legislature, in enacting these sections, contemplated that just such a condition might arise as is here presented, for it provides that the case may be submitted to another grand jury, to be assembled at that or the next term of court. Of course, if a grand jury was in session when the demurrer was sustained to the indictment and the order of re-submission entered, it would have been the duty of the Commonwealth to have presented the evidence to that body. But where no grand jury is in session when the demurrer is sustained, it is clearly left to the discretion of the court as to whether or not a grand jury shall be summoned for that special purpose, or the case shall be passed until the next regular sitting of the grand jury. In view of this Code provision we are clearly of opinion that, although the indictment upon which appellant was tried was returned by the Marion County grand jury at its September term, such indictment was nevertheless to be treated by the court as a prosecution commenced in April, when the original indictment was returned. It being but a continuation of the prosecution set on foot at that time, the court did not err in refusing to require the Commonwealth to admit as true the statements set out in the affidavit filed for a continuance as the evidence of the absent witnesses.

Section 189 of the Criminal Code is mandatory, and in all cases where a continuance is asked at the term of court at which the indictment is returned, and a sufficient affidavit is filed in support of said motion, the

court must grant the continuance, unless the attorney for the Commonwealth consent that the statements in the affidavit for a continuance, as to what the accused would prove by the absent witnesses, if present, are true. The provisions of this section, however, are applicable only where a continuance is sought at the term at which the indictment is returned. In all other cases the attorney for the Commonwealth is only required to consent that the statements in the affidavit as to what the the absent witness would say may be read to the jury as the deposition of such absent witness. Clearly, the purpose of the Legislature in enacting this Code provision was to prevent one accused of a crime from being pressed to trial without having been given an opportunity to secure the attendance of his witnesses and prepare for his defense. Until an indictment is returned, it is presumed that the accused would not know the exact nature of the offense for which he is to be tried; hence the wisdom and necessity of this statute. When properly applied, it insures to the accused a reasonable time within which to secure the attendance of his witnesses. This is all it was intended to do. It should not be so applied as to enable the accused to harass the Commonwealth by necessarily and unreasonably delaying the trial.

Here the accused was indicted in April, charged with rape. The trial was originally set for June. He knew what he was charged with, who the prosecuting witness was, and what witnesses he would need to properly present his defense. At the June term he was represented by able counsel; and when the demurrer, on his motion, was sustained to the original indictment, and leave given to the Commonwealth to re-submit the case to the September grand jury, he knew—or rather, his counsel for him knew—that another indictment would be returned, amending, as it were, the indictment which had been returned in April preceding, and that the charge in that indictment would be the same as that in the original indictment. When arrested on the warrant and put upon his examining trial before the county judge, he could have had any witnesses desired subpoenaed and recognized to appear before the circuit court at its April term. Criminal Code, section 69. If the witnesses so recognized or subpoenaed had failed to appear at the April term, the trial judge would have directed attach-

ments for them at the defendant's request, returnable
to the special June term. At the June term, when the
case was continued, the trial judge would have, at de-
fendant's request, recognized any witnesses for him,
requiring them to appear at the next regular term of
court, or would have issued attachments for any who
had failed to appear at that term. But no such request
was made. By section 150 of the Criminal Code the
clerk is authorized, upon application of the defendant
in a criminal prosecution, to issue subpoenas for any
witnesses desired. Hence, the power and the processes
of the court had been open to appellant from the date
of his examining trial at all times up until the trial
which resulted in his conviction was had. This being
true, he had ample opportunity to procure, and even co-
erce, the attendance of such witnesses as he desired, and
there was no necessity for invoking the aid of section 189
of the Criminal Code.

This conclusion is in harmony with the reasoning of
this court in the case of Wiggins v. Commonwealth, 104
Ky., 765. In that case the accused was indicted for the
murder of John Bruce. The indictment was thereafter
quashed and the case re-submitted to the grand jury
and a new indictment returned, charging him with the
murder of N. K. Bruce. The case was at once called
for trial and defendant sought a continuance on the
ground of absent witnesses, and filed in support of this
motion his affidavit showing what the absent witnesses
would say. He asked, if the continuance was not
granted, that this statement of the absent witnesses be
read to the jury as true. The Commonwealth objected
and the court permitted it to be read as the deposition
of the absent witnesses. Upon conviction an appeal
was prosecuted here and a reversal sought because of
this ruling. In passing upon the question this court
said:

"There seems to be nothing in this record to show
that the killing of N. K. Bruce, charged in the second
indictment, was the same offense charged in the former
indictment; and, this being so, we are constrained to
the conclusion that section 189 of the Code applies."

Manifestly, if it had been made to appear that N. K.
Bruce and John Bruce were one and the same man, the
indictment returned upon the re-submission of the case
would have been treated as merely amending the former
indictment, and hence the ruling of the trial court would

not have been error. In the case at bar the record shows that the charge in the indictment returned on October third is for the identical offense as that set up in the indictment returned at the April term. Hence, it is apparent that the court did not err in refusing to require the Commonwealth to admit as true the statements in the affidavits as to what the absent witnesses would say.

The next ground urged for a reversal is that, after ten of the jurors had qualified and been accepted, they were permitted to separate during the noon hour, and that two of them, so separated, met some ladies at the home of a friend who were taking an active interest in the prosecution, and discussed the case with them; and that opportunity was given for the other eight jurors to be talked with about the case and perhaps influenced to the prejudice of appellant. In the bill of evidence the judge states that, while at the time this separation was permitted to take place, these ten jurors had qualified themselves, they had been accepted by neither the Commonwealth nor the accused. The affidavit of the official stenographer of the court, who took down the proceedings, shows that at the time this separation was permitted to take place these ten jurors had been accepted by the Commonwealth, but not by the accused. And the affidavits of two of the jurors who sat in the case to the effect that at the time of their separation they had been accepted by both the Commonwealth and the accused. We are satisfied from a consideration of the evidence before us that at the time this separation was permitted these jurors had not been accepted or passed upon by the accused, and there is doubt as to whether they had been accepted by the Commonwealth. It is conceded that they had qualified themselves for jury service; but this fact alone did not require that they should be kept together. Section 244 of the Criminal Code provides that they shall not be permitted to separate after they are accepted. This necessarily means accepted by both the Commonwealth and the accused, and while to our mind the better practice in felony cases, and particularly those in which the death penalty may be inflicted, is to keep the jurors together in charge of an officer selected and sworn by the court for that purpose at all times after they have qualified for jury service, still the provision of the Code does not make this mandatory, and the failure of the judge so to do could not be treated as reversible error. There is no evidence in the record to

support the affidavit of appellant to the effect that any of these jurors did converse with any one during their separation about the case, or that they were in any wise influenced or prejudiced against him during such time.

Much complaint is made of the instructions, or rather, the failure of the court to give to the jury other instructions. The court gave the following instructions:

"If you shall believe from the evidence beyond a reasonable doubt that the defendant, John Bowman, in this county and before the finding of this indictment had unlawful carnal knowledge of Minnie Lamb by force or by putting her in fear of her life and against her will, you should find him guilty of rape and fix his punishment at confinement in the State Penitentiary for not less than ten nor more than twenty years, or at death in your discretion.

"The law presumes the defendant to be innocent, and unless you believe he is proven guilty beyond a reasonable doubt, you should find him not guilty.

"The burden is on the Commonwealth to prove beyond a reasonable doubt every material fact necessary to constitute the guilt of the accused and if the Commonwealth has failed to prove any such fact you should find the defendant not guilty. The material facts are set out in instruction number one.

"It is your duty, if you can consistently do so, to reconcile all the facts and circumstances proven in the case to the innocence of the defendant, and find him not guilty."

These instructions presented the whole law of the case and every phase of the defense suggested by counsel for appellant in the numerous instructions offered by him, which is fully covered by the instructions, two, three and four, in which the jury is plainly told that every doubt must be resolved in favor of the accused, and that his innocence is presumed, and that every circumstance brought out in the evidence must be harmonized with the theory of the accused's innocence if it can consistently be done. No verdict of conviction could have been returned by the jury except they believed that he forcibly and against the will of his victim carnally knew her.

Instructions are based upon the evidence, and, under the evidence in this case, defendant was guilty either or rape or no offense known to law. He could not be guilty of unlawfully taking or detaining a woman against her

will, because he admits that he carnally knew her. The statutory offense of unlawfully taking or detaining a woman against her will applies only in that class of cases where she is taken or detained with the intent to marry her, or to have her married to another, or to have carnal knowledge of her, or that another shall have carnal knowledge of her. The gravamen of this offense is the taking or detaining for such a purpose without accomplishing the purpose. When the purpose is accomplished, that is, when the woman so taken or detained is carnally known, the minor or statutory offense is swallowed up in the larger offense of rape. Defendant admitted the act of criminal intimacy with the prosecuting witness, but insisted that she freely consented to it. Thus, under the facts, the court held that no instruction under section 1158 of the statutes should be given.

It is next urged that his plea of former jeopardy should have been sustained. As stated, when the case was called for trial at the special June term, a jury was selected and sworn to try the case, and thereafter counsel for appellant entered a demurrer to the indictment, which was sustained, with leave to the Commonwealth to re-submit it to the grand jury. The trial was stayed at the instance and request of counsel for accused upon the ground that the indictment was not sufficient to support a verdict of guilty if one should be returned, and, as was expressly held by this court in Williams v. Commonwealth, 78 Ky., 93, and again in Gaskin v. Commonwealth, 97 Ky., 494, a person is not in legal jeopardy when he is put upon trial before a court of incompetent jurisdiction, or upon an indictment or information which is insufficient in form and substance to sustain a conviction. And where, during the progress of a trial, it is made to appear that either of these facts exists, and the jury is discharged, the accused can not thereafter plead that trial and acquittal as a bar to further proceedings. Here the indictment was fatally defective. The trial court, on motion of the accused, so held, and directed the re-submission of the case to the grand jury. Under these circumstances the plea of former jeopardy is of no avail.

It is next urged as a ground for reversal that the county and Commonwealth attorneys, in their closing arguments to the jury, were guilty of such misconduct as to influence the minds of the jury against him to his prejudice. An examination of these arguments, or

rather the portions thereof to which objection is made, does not warrant the charge that either of said attorneys was guilty of misconduct. They spoke of the accused and his associate and chief witness in harsh, we might say, severe, terms. Their arraignment of the accused was particularly severe; not more so, however, than the character of the crime which he was charged with having committed justified. The evidence for the Commonwealth showed him to be a man wholly unreliable, unworthy of belief, and of bad moral character; and the manner in which he testified in this case showed him to be, not only utterly devoid of any of the finer manly instincts and qualities, but absolutely vulgar and brutal in his nature.

Complaint is made that the court erred in permitting the Commonwealth to prove that defendant was a man whose reputation for morality, truth and veracity was bad; and that he likewise erred in permitting the Commonwealth to prove that the reputation of the prosecuting witness, Minnie Lamb, for morality was good.

As to the first proposition, in Barton v. Commonwealth, 17 Rep., 580, this identical question was decided. There the accused testified in his own behalf, but offered no evidence tending to show a good moral character. The Commonwealth then introduced several witnesses, who testified that the general moral character of the accused was bad. Upon appeal here it was insisted that this was error, that the Commonwealth had no right to introduce evidence of the bad character of accused when he had not put his character in issue. In holding the point not well taken, this court said:

"When the accused testified for himself he placed himself in the exact position of any other witness, and his testimony was subject to impeachment in the same way as that of any other witness who may have testified in the case." See, also, Lockhardt v. Commonwealth, 87 Ky., 201.

As to the second proposition, the Commonwealth offered no evidence tending to establish the good character of the prosecuting witness until after the defense had offered evidence the purpose of which was to show that she was a woman of bad moral character. Clearly, the Commonwealth was justified in offering evidence to overcome or rebut this evidence introduced by the defendant. In Wigmore on Evidence, volume 1, page 62, the author says:

"The admissibility of the complainant's character for chastity or unchastity is generally conceded; and her habits as a prostitute are usually regarded as an equivalent to a general trait of character."

According to the weight of authority, evidence of this character is admissible, as tending to show a likelihood of consent or non-consent, as the case might be, the authorities generally agreeing that a woman of bad moral character would be more apt to give her consent to criminal intimacy with a man than one of good moral character. And where the accused charges that the act was done with the consent of the prosecuting witness, if it can be shown for her that her reputation for chastity and morality is good, this evidence tends in a degree to rebut the idea that she would consent to such an act, because it would be repugnant to all her moral feelings and inconsistent with her past conduct. The admission of this evidence was proper.

Lastly, it is urged that the verdict is not supported by the evidence. This necessitates a consideration or review of the evidence. The prosecuting witness, Minnie Lamb, testifies that she had met accused on three or four occasions before the date upon which he is charged with having committed the rape upon her; that she always met him either at the home of her sister or in the nearby village, when in company with her sister. On the day in question he called at the home of her sister, the wife of John Carrico, in the forenoon, and stayed but a short time. Later in the evening, somewhere between four and five o'clock, he drove up to the home of her sister in a buggy and called to her. She went out, and was invited to take a ride with him. She consulted her sister as to whether or not she should do so, and, upon being advised that it was getting rather late, she and her siser both testify that appellant said they would go only a short distance and come back. With this explanation on his part, her sister gave her consent, and they started to take the drive. When they had gone the distance which he said they were to go, she states she requested him to turn the buggy and take her back home. He thereupon declined to do so, and notified her that he was not going to do so. She then inquired where he was going to take her; whereupon she was informed that it was none of her business. He drove on some distance, to a place, known as the "Sulphur Spring," the location of which is not accurately described in the record; but from pho-

tographs thereof, it is at the end of a heavily shaded
lane. Here they stopped. On the road to this place
she testifies that he cursed her and abused her. After
they got there he continued to do so, struck her in the
face, so as to cause her nose to bleed, bit her in the
breast, and thoroughly cowed and intimidated her. He
had a bottle of whiskey and tried to make her drink
therefrom.

While they were sitting there in the buggy, three
men passed, going to the spring; and about that time
Clarence Alford, whom they had passed walking on the
road in the same direction in which they were going,
came up. She called upon Alford to give her a drink of
water, and at his suggestion she got out of the buggy,
went up to the spring and got it. She asked him to make
appellant take her home, and objected to getting back
in the buggy while he was refusing to do so. At this ap-
pellant caught hold of her and put her forcibly into the
buggy. It was then about dark. She testifies that after
these parties had gone away he got out of the buggy,
spread the laprobe upon the ground, took hold of her
arm, pulled her out of the buggy, forced her upon the
ground, and there carnally knew her. That, having ac-
complished his purpose, he let her up and permitted
her to get back into the buggy. Whereupon Alford came
up and appellant made some excuse to leave the buggy
and leave her in charge of Alford, who no sooner than
appellant was out of sight, likewise assaulted her. That
thereupon appellant returned and Alford disappeared,
and shortly after he had done so appellant again took
hold of her, took her out of the buggy and misused her
as he had previously done. That thereafter he per-
mitted her get into the buggy, he got in with her, and
together they started home. On the road home he
turned the buggy over, but got out and straigtened it
up, put her back in and took her to the gate near her
sister's residence, put her out and drove away. This
was about seven-thirty in the evening. She told her
sister what had occurred, and upon the following morn-
ing she, with her sister, went to the city, consulted with
the county attorney and the county judge, and later
caused his arrest, which resulted in this prosecution.

Appellant testifies that he borrowed the buggy of
his friend and cousin, Alford, went out to her sister's
home, invited her to ride with him, took her down to
the Sulphur Spring; admits carnally knowing her

there; admits that he saw his cousin carnally know her; denies that he did so more than one time, and denies that he used any force whatever in doing so, but insists that it was with her acquiescence and consent. He says that he first attempted to accomplish the act with her consent in the buggy, but, being unable to do so, she got out; that she did so of her own accord and that he used no force whatever. He denies that he was drinking, and denies that he struck her, bit her, cursed her or abused her. He further testifies that he had taken undue liberties with her at the home of her sister in the presence of her sister and brother-in-law, and that she had in his presence, and in the presence of Horace Spalding told vulgar jokes and stories, and had otherwise given abundant evidence that she was an unchaste, lewd woman.

There are some features of the case that are difficult to understand and harmonize. She testifies that, while she was being ravished, she made no outcry and made no resistance, as she was terror-stricken and afraid to do anything. It is proven by no less than three disinterested witnesses that he was cursing and abusing her while they were there in the buggy at the spring, and that he forcibly prevented her from leaving the buggy after he had thrown her into it. Even though thus terrorized by reason of his abuse and mistreatment of her, it is difficult to understand how she could permit herself to be thus mistreated without offering some physical resistance; and yet she says she did not. On the other hand, it is apparent from the record that she was a very ignorant girl. Her opportunities in life had been poor. Her education was meager, and her ideas of propriety and decency far from exalted. Still, from the evidence before us we are convinced that she was not a bad woman. This is shown by many facts. Her underskirts, when examined that night, showed that she must have suffered terribly at the hands of appellant and his cousin, for there was a part of the underskirt covered with blood. The doctor who examined her at the instance of the county attorney a few days afterwards testifies that, in his judgment, the hymen had been recently broken. If he was correct in his diagnosis, she had not theretofore had intercourse with anyone. She was but seventeen years of age. He was a man of mature years, had theretofore been, if he was not then,

married; and he had deliberately set about to accomplish this purpose.

This is the substance of the evidence of the prosecuting witness and the defendant. She is corroborated in many particulars by disinterested witnesses; while defendant is corroborated on no material point by anyone save Clarence Alford, jointly charged with him in the commission of the crime, and the absent witnesses, Horace Spalding and Stanley Cabbel, all of whom are thoroughly discredited. He testifies that he was not drinking. McHenry Bottoms says that he saw him taking a drink from a bottle at the spring. He testifies that he did not curse her. Both Lamot Spalding and McHenry Bottoms testify that he cursed her and abused her shamefully in their presence while they were at the spring. He denied forcibly putting her into the buggy after she had gotten out to get a drink. McHenry Bottoms testifies that he saw defendant forcibly put her in the buggy when she objected to getting in, and saw him hold her in after he got her there. He testifies that he did not bite her. Dr. Kobert, who made an examination some three or four days afterwards, found upon her breast the dark blue places where she says he bit her. She testifies that she said, while these three men were at the spring, and in their hearing, "Ain't it a shame the way he is treating me?" McHenry Bottoms corroborates her in the main in this, for he says that while there she said, "John, you have treated me mighty mean." Both John Carrico and his wife testify that at no time while defendant was visiting her at their house was she guilty of any improper conduct, and that neither she nor anyone else indulged in any indecent or improper talk at their home of the character detailed by defendant.

Defendant is supported in his testimony by Clarence Alford as to all matters which passed between himself and the prosecuting witness in the presence of Alford; and while Alford admits having had sexual intercourse with the prosecuting witness at the time she charges, he insists that it was with her acquiescence and consent; and he states that when his cousin, the defendant, did so, while he was not present, he was but a short distance away, and heard no outcry or evidence of a struggle. Horace Spalding and Stanley Cabbel each corroborate the defendant in that part of his testimony which goes to show that the prosecuting witness was an

unchaste, immoral womn. Ben Wayne testifies that he
went to the spring on that night after dark, and that
when he passed the buggy a man and a woman were
standing by the side of it, the woman with her back
turned toward him. He said nothing to her and she
did not speak to him. From his testimony, he evidently
passed immediately after defendant had committed his
first act of violence to the person of Miss Lamb. After
he had passed toward the spring defendant demanded
his name. He gave a name other than his true name;
but defendant followed him, and then he gave his true
name. He got the water for which he went to the spring
and left at once. Apparently, from his testimony, Miss
Lamb was still on the ground, standing by the buggy,
when he left. James Bowman, a brother of defendant,
testified that he heard his brother John was charged
with having bitten the breast of the prosecuting wit-
ness, and he went to the home of her sister on the fol-
lowing Wednesday, or about the time that he was ar-
rested, and asked Miss Lamb if his brother had in fact
bitten her; that while she claimed he had, upon his re-
quest that she show him where, she bared her breast,
but that he could find evidence of no such injury as she
claimed to have received. His testimony is flatly con-
tradicted by the doctor and Mrs. Carrico. This is all
of the evidence.

Counsel earnestly insists that it is not enough that
the prosecuting witness objected to being taken from the
buggy and forced to the ground, but that, in order to
constitute the crime of rape, she must have objected or
resisted when her person was being entered. The stat-
ute does not require that she either object or resist, but
simply provides that, if the act is done without her con-
sent and against her will, it is rape. The fact that she
remained silent or failed to offer active resistance while
the act was being committed might properly be con-
sidered by the jury as a circumstance tending to show
that she was, in fact, consenting. But consent will not
be presumed by mere silence in a case of this character;
and this is especially true if the failure on the part of
the prosecutrix to resist or object was because she had
been thoroughly terrorized or frightened by appellant.
In this case she knew that he was drinking, and was
abusive and ugly in his manner toward her. He had
treated her badly in the presence of three men, and,
after they left, had struck her in the face so as to make

her nose bleed, and had bit her on the breast in at least two places. How any woman, whether virtuous or depraved, would be willing to yield herself to a man who had treated her as appellant had there in the presence of witnesses, and as she says he did after they left, is beyond the power of conception. It is both unnatural and unreasonable to believe that she would be willing to or did consent. The simple and free manner in which she testified evidently convinced the jury that she was telling the truth. If she had been manufacturing a story she could easily have said that she offered all the resistance she could, even after he had forced her to the ground, and that she tried to cry out and call for aid, but that he choked her so she could not. Such statements on her part would have proven most damaging. Instead, she tells what occurred, as we believe, just as it did occur, and says that she offered no further resistance because she was frightened and afraid to. Surely the ends of justice would not require that she should have been beaten into submission or choked into silence before she could claim that she was an unwilling victim of his lust. She doubtless realized, if she was, because of her fright, capable of thinking, that she was hopelessly and helplessly in the power of this lecherous man, whose conduct was more beast-like than human; and manifestly, under such circumstances, her silence and failure to offer further resistance after he had forced her to the ground should not be construed as giving her consent to being outraged.

We realize full well that the very fact that the appellant is charged with the crime of rape places him at a disadvantage. Still, if the jury accepted the testimony of the prosecuting witness as true, the punishment fixed in this case, while the severest known to the law, is what, in their wisdom, the law-makers have said is merited by one found guilty of this offense. We have carefully and with great pains considered every question raised by counsel for appellant, and fail to find wherein any error was committed during the progress of the trial of which he may justly complain. It is peculiarly the province of the jury to determine the question of guilt or innocence, and, there being abundant evidence to support the finding, the judgment is affirmed.