## Combs v. Commonwealth.

(Decided October 20, 1914.)

### Appeal from Floyd Circuit Court.

1. Criminal Law—Venue—Change of Venue.—The burden is on the applicant for a change of venue to show that a fair trial cannot be had in the county; and mere proof of the fact that defendant's victim had a number of relatives in the county is not sufficient to establish such a state of public opinion as would operate to deprive the accused of a fair trial therein.

2. Criminal Law—Trial—Custody of Jury.—Objection being made by defendant that the sheriff was related to the man for the killing of whom defendant was on trial, the jury with the consent of defendant was placed in the custody of a deputy sheriff; after verdict was returned, defendant filed affidavit in support of motion for a new trial, alleging that he had just learned that the deputy sheriff was also related to the deceased; and it appears that the grandmothers of the deceased and of the deputy sheriff who had charge of the jury were half-sisters. The deputy sheriff filed affidavit that he properly discharged his duties as custodian of the jury. Held, the conviction of defendant would not be nullified on this account.

3. Criminal Law—Trial—Argument and Conduct of Counsel—Record and Proceedings Not In Record.—Argument of counsel in a criminal case held not reviewable unless the language and objection

thereto and ruling of the court thereon be preserved in the bill of exceptions.

4.  Criminal Law—Evidence—Other Offenses and Character of Accused.—Testimony that defendant a short time before he killed the person for whose murder he was on trial, had tried to get into a controversy with another, and had said he would shoot his father as quick as he would shoot any one else, defendant having a pistol in his hand at the time, was admissible as substantive evidence tending to show that he was in a frame of mind to kill some one and that he killed deceased because of that fact rather than in self-defense as claimed upon the trial.

5.  Criminal Law—Evidence—Character of Accused.—The defendant in a criminal prosecution, when he testifies, may be impeached in the same manner as any other witness; and therefore he may be impeached by proof of general reputation for immorality; but such evidence should be admitted, when offered for impeaching purposes, only under admonition that such is the only purpose for which it may be considered. Such evidence is not substantive unless the defendant has placed his character in issue.

A. F. BYRD, HARKINS & HARKINS and J. M. BOWLING for appellant.

W. H. MAY, Commonwealth's Attorney, and JAMES GARNETT, Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

Wesley Combs shot and killed James Salisbury, a merchant residing at the mouth of Beaver Creek, in Floyd County, Kentucky, in the latter's store-house, on July 17, 1913.

He was tried and convicted of the crime of wilful murder at the February term, 1914, of the Floyd Circuit Court, and his punishment fixed at confinement during life in the penitentiary; and from the judgment of conviction he appeals.

It appears from the evidence that there had been some previous trouble between Combs and the deceased, and that on the day of the killing, Combs, Newberry Brown, Buffalo Hall and Girard Richmond had been together quite a little, and that a short time before the killing, they had been in Salisbury's store drinking cider, when Brown and Combs got into a quarrel, whereupon Salisbury told them that if they wanted to quarrel to go on the outside. Combs replied that he didn't have to, but finally went. Soon thereafter Brown returned to the store and went in, and he was followed by Combs,

Hall and Richmond. They called for some cider and drank it, and after talking a short time, Richmond started out, but stopped at the door to wait for the others. Brown and Hall were apparently trying to induce Combs to go with them, and Salisbury was also urging him to go, saying he wanted to close up and get his supper. Combs had his pistol out in his hand, holding it behind him; and when Salisbury told him to go on out, he replied that he didn't have to, and fired four shots at Salisbury, one of which struck him in the back part of his arm, one in the back part of his shoulder and one in the back part of his body, going squarely through him, and killing him almost instantly.

Combs testified that deceased had a pistol drawn upon him when he fired, but this is denied by Mrs. Salisbury, widow of the deceased, who was the only person present other than defendant and Brown, Hall and Richmond when her husband was killed, and who swore that her husband had no pistol at the time and had his back to Combs when he was shot.

There was some proof that Brown had taken a pistol away from Hall and that this was the weapon with which Salisbury was killed. Defendant, Combs, testified that he took the pistol away from Brown because Brown had been in the habit of getting drunk and shooting up the town.

The grand jury indicted all four of them for the murder of Salisbury, and counsel for appellant claim that this action of the grand jury in joining Brown, Hall and Richmond in the indictment was for the purpose of discrediting them as witnesses in testifying for the defendant, and not in good faith or in the belief that they were really guilty.

If the charge made by counsel were true, such procedure should be severely condemned; but the record fails to establish the truth of the charge. According to the testimony of defendant and Brown, Hall and Richmond, the four of them were together nearly all the afternoon of the killing, and were in Salisbury's store twice together before the killing, going in together and out together; and just before the killing they went out together and went around the side of the building and remained in conversation for some time, and then all went back into the store, when the killing was done. According to the testimony of the defendant, and of Brown and Hall, the killing was done with Hall's pistol, which

Brown had obtained from Hall, and which Combs had obtained from Brown.

The grand jury was justified alone from the testimony of the parties themselves in believing that a conspiracy existed, and in indicting them all.

As stated by counsel for appellant in his brief, the chief grounds relied upon for a reversal are: "(1) .The failure of the court to grant the defendant a change of venue; (2) because the sheriff who had charge of the jury during the trial was related to the deceased; (3) misconduct of employed counsel in his argument to the jury; (4) impeachment of the defendant's moral character at the time of the trial and without confining such evidence to his general reputation previous to the charge against him for which he was tried; and (5) the admission of evidence offered by the Commonwealth as to acts and declarations of the defendant prior to the killing, which had no reference to the deceased nor to the trouble in which deceased was killed."

These will be discussed in their order.

1. Referring first to the contention, that the trial court erred in denying the application for a change of venue. It is alleged in the petition filed seeking a change of venue that Salisbury was a member of an influential family and was extensively related throughout Floyd County, many of his kinspeople being prominent in business, social and political affairs, while defendant had resided in the county only eight years and had no relatives therein except his parents and his brothers; and as grounds for the application, it was alleged that the state of public opinion in Floyd County was such against the defendant that he could not have a fair and impartial trial therein.

With this petition were filed the affidavits of Ham Wallen and of Larce Burchett, each of whom stated therein that the affiant was acquainted with the state of public opinion in Floyd County, and that the allegations of the petition for a change of venue were true.

However, upon examination by counsel for the Commonwealth at the hearing of the application for the change of venue, it developed that Burchett did not know whether Salisbury was married or single, did not know to whom Salisbury was related, and did not know anything about the state of public opinion in Floyd County in respect to this matter, except that he stated that he had heard three men unknown to him talking on one oc-

casion at the mouth of Beaver Creek, and they said Combs could not get a fair trial in Floyd County, these being the only persons by whom he had ever heard the matter discussed.

The other affiant, Wallen, on examination by counsel for the Commonwealth, could not recall the name of any person by whom he had heard discussed the matter of defendant's ability to have a fair and impartial trial in Floyd County; and the witness himself did not appear to be of the opinion that such a trial could not be had by defendant.

James Patton, who testified for defendant upon the hearing of the application for a change of venue, said the feeling against defendant seemed to be pretty bad— that it seemed that defendant bore a bad name; and that he couldn't say whether it was probable that defendant could have a fair and impartial trial in Floyd County.

John Sellards testified for defendant that there seemed to be some sentiment against him; but he could not say whether defendant could get a fair trial in Floyd County or not. Solomon McGuire testified for defendant that he had some doubts as to whether defendant could have a fair trial in Floyd County.

The Commonwealth, upon the hearing of the application for a change of venue, introduced A. J. Wright, H. C. Hobson and Ali Ward, two of whom testified that they thought defendant could, and the other that he knew of no reason why defendant could not, get a fair trial in Floyd County.

In point of fact, the testimony both for and against the application was somewhat non-committal, failing to exhibit any definite state of public opinion in Floyd County in respect to the defendant and his trial. The defendant, in his petition, charged that the state of public opinion was such that he could not have a fair trial in Floyd County, and the burden of proof was on him to show such a state of public opinion as would indicate a reasonable probability of his being unable to obtain an impartial trial. Mere proof of the fact that defendant's victim had a number of relatives in the county was not sufficient to establish such a state of public opinion as would operate to deprive him of a trial therein. And, upon this state of record, we do not think that the trial court abused its discretion in denying the defendant's application for a change of venue.

2. As to the complaint that Jonathan Fitzpatrick, the deputy sheriff in whose custody the trial court placed the jury by whom appellant was tried, was related to the deceased, James Salisbury, it seems that the sheriff of Floyd County was related to Salisbury, and that objection being made by defendant to the jury being placed in the custody of the sheriff, a deputy sheriff, Fitzpatrick, was entrusted with that duty.

It is charged in defendant's affidavit filed in support of his motion for a new trial, that the mother of James Salisbury and the mother of Jonathan Fitzpatrick were half-sisters, and that this fact did not become known to the defendant until after the verdict had been returned. A counter-affidavit filed by Fitzpatrick declares that his mother and the mother of James Salisbury were not related in any way; and that while the jury was in his custody he did not directly or indirectly speak to any of the jurors about any matter pertaining to the trial or affecting the question of defendant's guilt or innocence; that the case was not mentioned to the jurors by him or any other person while they were in his charge; that he did not permit them to communicate with any other person about any matter except under the direct supervision of the court during the trial.

Defendant then filed the affidavit of Joel Martin, who swore that the grandmothers of Salisbury and of Fitzpatrick were half-sisters; that Fitzpatrick's grandmother, Rhoda Fitzpatrick, was a daughter of Adam Gearheart, and James Salisbury's grandmother, Rhoda Salisbury, was always recognized as a daughter of Adam Gearheart. So if any relationship existed, it was merely a reputed relationship. There is in the record no intimation, hint or suggestion that the deputy sheriff was guilty of any improper conduct while the jury was in his custody, and the record shows that not only did the defendant fail to object, but that he consented to the jury being placed in the custody of this deputy sheriff. And the record fails to show that defendant was in any manner prejudiced by reason of this deputy sheriff having charge of the jury.

3. As to the next ground relied upon, i. e., misconduct of counsel for the Commonwealth in the use of improper language in his closing argument to the jury:

The language attributed to the Commonwealth's attorney first appears in defendant's motion for a new

trial; and the attorney filed his affidavit denying the use of the language charged.

The language complained of does not appear in the bill of exceptions, nor is it shown that any objection was made to the use of the language complained of at the time it was uttered, or that the court was asked to rule upon such objection. It can not, therefore, be considered on appeal. Hendrickson v. Commonwealth, 147 Ky., 298, 143 S. W., 993, and cases therein cited.

4. Concerning the ruling of the trial court admitting testimony as to acts and declarations of the defendant prior to the killing. It appears from the record that Dr. Ed. Stumbo was permitted, over the objection of defendant, to testify that just before Combs shot and killed Salisbury, Combs was on the street in front of a building about fifty feet from Salisbury's store, and the witness was up-stairs unpacking some drugs. He threw a box down on the ground near where Combs was standing, and Combs said to the witness that if he wanted anything to come on down on the street, Combs drawing a pistol from his pocket as he spoke. The witness further testified that he said to Combs that he had better be careful or his father would catch him, and that Combs replied that he would shoot Uncle Shade (Combs' father), as quick as he would shoot any one else; and that this incident occurred just a short time before Combs went into Salisbury's store when the killing took place. Being a circumstance tending to show the state of appellant's mind, and tending to show that he killed deceased because he was in the frame of mind to kill some one rather than in self-defense as he claimed upon the trial, this evidence was competent; and the trial court properly admitted it. Hendrickson v. Commonwealth, 147 Ky., 298, 143 S. W., 993; Brooks v. Commonwealth, 100 Ky., 194; Whitaker v. Commonwealth, 17 S. W., 358, 13 R., 504.

5. Referring now to the action of the trial court in permitting proof of defendant's reputation for immorality to be introduced for the purpose of impeaching his credibility as a witness, without confining the inquiry to a time previous to the killing of Salisbury, for which he was on trial.

Five witnesses were asked: "Are you acquainted with the general moral reputation of the defendant, Wesley Combs, in the community in which he lives, from what the people say about him?" And each of the wit-

nesses, after qualifying, stated that defendant's reputation for morality was bad, which evidence was permitted to go to the jury under the admonition of the court that it could be considered only as bearing on the credibility of the defendant as a witness.

Counsel for appellant insists that "it is a well-settled rule of law in this state, as well as a well-settled rule of evidence everywhere, that the impeachment of a defendant's moral reputation must be confined to his reputation prior to the time he was accused of the crime with which he is being charged;" and that "this question seems to have been fully discussed and passed upon by the court for the first time in the case of White v. Commonwealth, 80 Ky., 480."

This decision is evidently misunderstood by counsel for appellant. The opinion in the White case was delivered at a time when the defendant in criminal prosecutions was not permitted to testify, the opinion bearing date November 4, 1882, while the act permitting defendants in criminal prosecutions to testify was enacted May 1, 1886. (General Statutes, p. 548.) The evidence mentioned in the White case was not offered for the purpose of impeaching the credibility of the defendant as a witness; it was introduced as substantive evidence bearing on the presumption of defendant's innocence of the crime with which he was charged; and the court held in that case that evidence of character (offered as substantive evidence) must be confined to the time of the discovery of the crime. The White case was followed and cited in Allen v. Commonwealth, 134 Ky., 110, 119 S. W., 795, in which the evidence in question is mentioned as character evidence, and not as impeaching the credibility of the defendant as a witness.

Evidence concerning the character of a defendant in a criminal prosecution, when offered only for the purpose of affecting his credibility as a witness, must not be confused with evidence of defendant's character offered for the purpose of creating or supporting an inference that he did or did not commit the crime with which he is charged and for which he is on trial.

Evidence of the reputation for immorality of a defendant in a criminal prosecution, when offered for impeaching purposes, is always admissible, after defendant has testified; but, when evidence of general reputation for immorality of a defendant in a criminal prosecution is offered as substantive evidence for the purpose

of creating or supporting an inference that he did commit the crime charged, it is only admissible after the defendant himself has put his character in issue. Young v. Commonwealth, 6 Bush, 312; Wigmore on Evidence, section 58; Chamberlayne on Evidence, section 3275.

When the defendant himself puts his character in issue and offers proof thereof in aid of the presumption of innocence, then the prosecution may rebut such evidence by proof of general reputation for immorality, and in such case the inquiry must be confined to proof of reputation at or prior to the date of the discovery of the commission of the offense. White v. Commonwealth, *supra*.

Chamberlayne, in his exhaustive work on Evidence, Vol. IV, sections 3275-3276, says:

"In criminal cases, it is a well-established general rule that the prosecution may not introduce evidence of the character of the accused for the purpose of raising an inference that the latter is guilty of the crime for which he is being tried. * * * However, what might appear like an exception should be noticed. When the accused takes the stand as a witness, he occupies a double position. As a defendant in a criminal action, he has the right to object to all evidence concerning his character, offered for the purpose of proving conduct, unless this privilege has been abridged or curtailed because of the rights of the prosecution arising from the fact that he has chosen to be a witness. May the accused, after being sworn as a witness, still take shelter behind this privilege as the accused, and successfully object to any evidence concerning his character? It is universally held that he can not, but that he may be impeached like any other witness in accordance with the rule prevailing in the particular jurisdiction."

In the following cases, decided since the Act of 1886 became effective, this court, following this general rule, has held that the defendant in a criminal prosecution may be impeached by proof of general reputation for immorality, as any other witness in accordance with the prevailing rule, although such evidence may be admitted only under admonition that it goes only to affect the credibility of the defendant as a witness. Lockard v. Commonwealth, 87 Ky., 201; Hasson v. Com., 11 S. W., 286, 10 R., 1054; Pace v. Commonwealth, 89 Ky., 204, 12 S. W., 271, 11 R., 407; Whitaker v. Commonwealth, 17 S. W., 358, 13 R., 504; Crump v. Commonwealth, 20

S. W., 390, 14 R., 450; Barton v. Commonwealth, 32 S. W., 171, 17 R., 580; Trusty v. Commonwealth, 41 S. W., 766, 19 R., 706; Helm v. Commonwealth, 81 S. W., 270, 26 R., 165; Newman v. Commonwealth, 88 S. W., 1089, 28 R., 81; Bowman v. Commonwealth, 146 Ky., 486, 143 S. W., 47.

And, as a defendant, when he has offered himself as a witness, is subject to be impeached in the same manner as any other witness, it necessarily follows that when evidence of general reputation for immorality or for untruthfulness is offered for the purpose of impeaching the credibility of the defendant as a witness, the inquiry may be directed to that reputation as it exists at the time the defendant is testifying, without regard to the time when the offense was discovered, this being the rule prevailing in this State relative to impeachment of witnesses. This rule was first announced by this court in the case of Commonwealth v. Hourigan, 89 Ky., 305, in which the court said:

"Witnesses were called by the State and asked as to the general character of the accused for morality and truthfulness at the time he testified as a witness in the case. This was proper. The inquiry should have related to that time, and the court incorrectly held that it must relate to the time of the killing. (Mitchell v. Commonwealth, 78 Ky., 219.)"

In Smith v. Commonwealth, 140 Ky., 599, the court said:

"It has frequently been ruled that when a defendant in a criminal prosecution testifies in his own behalf, his reputation for truth and morality may be impeached in the same way as that of any other witness. It is proper that evidence upon this point should be confined approximately to the time when the accused offers himself as a witness, as this evidence goes to impeach his character as a witness."

Of course, the impeaching witnesses may be freely cross-examined relative to the extent and source of their knowledge, and as to the time when the reputation testified about was acquired, in order to determine the value of such testimony; but the effect of such testimony is to be passed upon by the jury without any admonition from the court other than the general admonition relative to the reception of impeaching testimony. But, as was said in the Smith case: "If it developed on the examination of a witness that he was influenced to say

that the reputation of the accused for truth and morality was bad because of the crime he had committed and which was then being investigated, and that independent of the odium attached to the accused for its commission, he had never heard his reputation for truth or morality discussed, it would not be proper to allow the witness to give evidence concerning the reputation of the accused." This, we think, the correct rule.

Counsel for appellant also cites the case of Gabbard v. Commonwealth, 159 Ky., 624. In that case, the question objected to was in the same form as in the case at bar; and the action of the trial court in admitting the proof of reputation for immorality, in answer to a general question, without confining the inquiry to a period prior to the discovery of the offense, was approved by this court. The decision of the court in that case is in harmony with this opinion, although some of the language therein used would appear to be susceptible of the interpretation placed upon it by appellant's counsel herein.

6. Appellant also complains of the action of the trial court in setting aside so much of the judgment entered at the trial term as sentenced him to the House of Reform until he should be twenty-one years of age. At the trial term, February, 1914, appellant, on his own motion, was sentenced to the House of Reform until he should arrive at the age of twenty-one years; and at the June term, 1914, the Commonwealth Attorney gave notice and entered a motion for a correction of that part of the original judgment. The court granted the motion, and reformed the judgment in so far as it ordered his confinement in the House of Reform until he should arrive at the age of twenty-one years. Appellant contends that this action of the court was prejudicial; but we think not. It would not have been lawful to have sent appellant to the House of Reform, and the Prison Commissioners would have transferred him to the Reformatory. Thompson v. Commonwealth, 159 Ky., 8. And the order having been made on appellant's own motion, he will not be heard to complain thereof.

Finding no error in the record, the judgment is affirmed.