## Jarvis v. Commonwealth.

(Decided October 27, 1931.)

EDWARD L. ALLEN, A. J. MAY and JOHN L. HARRINGTON for appellant.

J. W. CAMMACK, Attorney General, and A. M. SAMUELS for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The appellant, Elvey Jarvis, has been given a sentence of fifteen years in prison for killing John Stricklin on June 17, 1930. If the sacrifice of his life be not attributed to minds inflamed or deranged in a degree by the use of moonshine whisky, it is inexplicable. The contention that the verdict is flagrantly against the evidence requires a full statement of the facts.

Both parties, men with families, and two others had been roaming about all night through Floyd and Johnson counties drinking. The defendant, at least, had a pistol. His testimony makes it appear that, though drinking himself, he acted as something of a guardian over the deceased. About 7:30 in the morning the defendant had displayed a bad humor when momentarily obstructed on the road by a grader machine. He ordered the operator, Conley, to move out of the way, and the latter went to the car and threatened him. Stricklin advised him to pay no attention to him and to drive on. At the same time, according to Conley, Jarvis and Stricklin talked pretty rough to each other. About 8 o'clock they arrived at the deceased's home and ate breakfast. Mrs. Stricklin testified that while there the defendant took a pistol out of his sock and put it in the bosom of his shirt. Jarvis got up from the table and said to Stricklin, "Chick, I want to shake hands with you." To this he responded, "What do you mean?" He then said, "I want to shake hands with you; you will find out what I mean; I want to inform you you have taken your last ride." Stricklin said, "Man are you insane?" and Jarvis replied, "You have taken your last ride with me; get me?" He also said he was "going back up there to kill that man"—referring to one of their companions of the night before. Stricklin remon-

strated with him, and finally said he would go along. Jarvis protested on the ground that Mrs. Stricklin did not want him to go, but finally he told him to "come on." On the way they again encountered Conley, the road workman, and there defendant sought to pick a quarrel with him. Stricklin remonstrated, according to Conley, and, putting the car in gear, begged him to drive on, but Jarvis kept throwing the car out of gear and refused to go for quite awhile.

About three miles beyond this point was an abandoned place called Carter's roadhouse. Here the tragedy occurred. Several persons, who were from 100 to 300 yards away, testified that, their attention being attracted by several pistol shots, they saw Stricklin run across the road or open space to the porch and then fall off it; and in a moment Jarvis got in an automobile and drove away without having gone near the fallen man, who was dead when the parties got to him. Bushes about the place formed an obstruction to a clear view of what had occurred or was being done. Stricklin had been shot five or six times; some of the bullets entering the side and back. There were no powder burns on him. Witnesses who were soon upon the scene saw no weapon about him, but found some empty cartridge hulls corresponding to the caliber of the defendant's pistol.

It was shown that some time before this the defendant had said that Stricklin had been following him around like he wanted trouble, and, though he (the defendant) didn't want it, if he didn't quit, "we are going to have trouble," he "would have to hurt him." A merchant at Paintsville, introduced by the Commonwealth, testified that the defendant had several times left a pistol with him for an hour or so, and on one occasion, four or five months before the homicide, Jarvis and a friend had a conversation in low tones in his store, and he then heard the defendant say he was afraid to fight Stricklin in a fist fight, but he wasn't going to "run from him any farther." Stricklin was the larger man and had the reputation of being "a scrapper."

That was the evidence in chief for the commonwealth.

The defendant denied that he had displayed ill humor with the road workman or at Stricklin's home. On the contrary, he stated that the latter had then mistreated his wife. He also denied the threats testified to

by Mrs. Stricklin in respect to the third man. Both he and the deceased's wife unsuccessfully tried to prevent him from leaving home. When they got up the road a short distance, going toward the defendant's home, Stricklin insisted with profane emphasis that he be taken to Prestonsburg to see a certain woman. Because of the respect which he had for his wife, the defendant says, he would not take a drunken man to his home, and so drove on past it. The deceased was abusive along the way. When they got to Carter's roadhouse, the defendant testified he stopped to go to the toilet there, and, as he was getting out of the car, Stricklin grabbed him around the neck and pulled him through the car onto the ground saying, "I have got you where I want you; I am going to kill you." While he was getting his pistol from its holster, Stricklin reached for a piece of mine timber 4 or 5 feet away, and, as he straightened up with the club in his hands and was coming at him with it, he (the defendant) had gotten to his knees and began shooting to save his own life. At the sixth shot, Stricklin dropped the club and staggered across the road. He came directly to the sheriff's office and surrendered, telling the officer that he had shot a man who was about to choke him to death. He did not mention anything about the attack with the club.

The defendant proved that, when under the influence of whisky, the deceased had a bad reputation for "peace and violence." John Marshall testified that on the afternoon of the killing (which occurred apparently around 11 o'clock), he found at the scene a piece of mine timber, which was of seasoned oak, about 40 inches long, and weighing 12 or 14 pounds. He handed it to the defendant's father-in-law and attorney. This was introduced in evidence. The witness had gone to the scene after having a talk with the defendant in jail. The father-in-law testified the club was found the next day after the killing. Mrs. Sid Webb testified she was there a few minutes after the shooting and noticed a piece of timber lying there which looked like that presented in evidence.

In rebuttal and contradiction of the defendant's claim that he had been attacked with the club, the commonwealth undertook to prove that it was a defense made up afterward by showing that right after he had killed Stricklin, in relating to the two men while on the way to surrender and to the sheriff on his arrival at his office how it happened, he only claimed Stricklin was choking and strangling him and made no mention of any attack

with a club. Several witnesses who went promptly to the scene testified that they examined the premises closely and did not see the piece of timber introduced in evidence or any like it there, except that there was a stack of them 25 or 40 feet away.

Although the defendant testified to facts which, if accepted as true, proved he slew his adversary in self-defense, yet there was plenty of evidence of significant facts and circumstances from which the jury could with sound reason discount his story. We are not authorized to invade the province of the triers of fact, for it cannot be said that their conclusion is flagrantly or shockingly against the evidence.

Complaint is registered against the admission of evidence of the little quarrel with Conley, the man in charge of the road grader, as above detailed, which occurred three or four hours before. The court admonished the jury that the evidence of Conley should be considered only for the purpose of showing the "state of mind or mental status of the defendant at the time of the killing of Stricklin, if it does bear upon that question." We consider the evidence admissible under the admonition which the court gave. Combs v. Commonwealth, 160 Ky. 386, 169 S. W. 879.

The evidence of Hefner that several months before the defendant had upon several occasions deposited a pistol with him, while perhaps immaterial, could not have been prejudicial. The statement of the defendant before he left with the deceased that he was "going back up the road to kill that man" was so interwoven with the conversations between the parties, and so tended to explain the whole situation as to make doubtful its incompetency but, whether incompetent or not, we do not deem it prejudicial error of the character justifying a reversal of the judgment.

In support of the ground for a new trial, the appellant filed affidavits of several persons to the effect that they saw the club referred to at the scene of the tragedy a short while after it occurred. The defendant and counsel stated in affidavits that they had no knowledge before or during the trial that the newly found witnesses would so testify, the defendant also saying that he had been confined in jail for about ten days after the killing, and did not have opportunity to secure the necessary information to enable him to properly make a defense.

It may be observed that there was no motion for a continuance of the trial on this or any other account. It is a rule of practice demanded by the practical operation of the procedural law that newly discovered evidence which is cumulative in character is ordinarily not sufficient to warrant a retrial. There are a few very exceptional cases in which it was so regarded, but this cannot be placed in that class.

The appellant having had a fair trial, the judgment is affirmed.