### Mansfield v. Commonwealth.

(Decided March 11, 1915.)

Appeal from Barren Circuit Court.

1. Criminal Law—Change of Venue—Evidence.—The matter of granting a change of venue is largely in the discretion of the trial court, and unless it affirmatively appears that this discretion has been abused, the ruling of the trial court will not be interfered with.

2. Criminal Law—Change of Venue—Newspaper Articles.—Articles in newspapers published at the place where the crime was committed, denouncing the crime and demanding that speedy justice be administered, although admissible on the hearing of a

motion for a change of venue, are not in themselves cause for the removal. There must be other and independent testimony that the condition of public sentiment in the county is such that the accused cannot have a fair trial.

3. Criminal Law—Evidence—Experimental Evidence.—On the trial of the accused for murder, where his defense was that a pistol in the hands of the deceased was discharged while he was striking the accused over the head with the butt of it, thereby causing his death, and the pistol could not be produced on the trial, it was competent for the Commonwealth to permit witnesses to testify and demonstrate before the jury that a pistol such as the deceased had could not be discharged unless the trigger was pulled and the safety device pressed at the same time, after circumstantial evidence that the deceased had such a pistol when killed. .

4. Criminal Law—New Trial—Misconduct of Juror.—A motion for a new trial on the ground that a juror had expressed sentiments of hostility toward the accused before his selection as a juror, should not be sustained unless the evidence is clear and convincing that the juror made the statements attributed to him, and in matters like this the ruling of the trial court is entitled to great weight.

5. Criminal Law—Misconduct of Jury and Officer in Charge of.— It was not misconduct on the part of the officer in charge of the jury to permit a son of one of the jurors, who was under arrest, to talk to his father in the presence of the officer and the jury in regard to the matter for which he had been arrested. Nor was it misconduct on the part of the officer to permit the jury to go to a moving-picture show when it appeared that no person talked with the jury about the case on trial while they were at the show.

WHITE & SMITH and V. R. JONES for appellant.

JAMES GARNETT, Attorney General, and CHAS. H. MORRIS, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The appellant, Mansfield, and one Louie Pace were jointly indicted charged with the murder of Bob Thurman, who, at the time he was killed, was a police officer of the city of Glasgow. Having demanded separate trials, Mansfield, on his trial, was found guilty under the indictment and his punishment fixed at life imprisonment.

As no question is or could be made as to the sufficiency of the evidence to sustain the verdict, it will be unnecessary in this opinion to relate more of it than

will be required to illustrate the grounds relied on for reversal.

On the night he was killed Thurman, as an officer, was called on to suppress some disorderly conduct in a house in the city. In obedience to the summons he went to the place and there found Louie Pace. Mansfield had also been at this place with Pace, but a little while before Thurman arrived had left. Thurman arrested Pace, and on their way to the jail, where it was Thurman's intention to have Pace confined, they met Mansfield, or, at any rate, Mansfield made his appearance on the street, and almost immediately some ugly words passed between Mansfield and Thurman. In the altercation that ensued Thurman was shot and killed, and it is the claim of the Commonwealth that he was shot, without excuse, by either Mansfield or Pace, the one that did the shooting being aided and abetted by the other. Some people nearby heard the quarrel and the shot, but there were no immediate eye-witnesses to the killing except Mansfield, Pace and Thurman, and Thurman died very shortly after he was shot from the effect of the wound he received.

The theory of the defense was that Thurman, holding the barrel of his pistol in his hand, struck Mansfield, who was standing very near him, on the head with the butt end of it, thereby causing the pistol to be discharged, the bullet taking effect in Thurman's person and killing him.

The evidence shows that Thurman was a cool, courageous, courteous officer, at all times faithful and fearless in the discharge of his duty. He had been especially alert in suppressing the illegal sale of whiskey in Glasgow, and by his vigilance in the discharge of his duties in putting down this unlawful traffic, as well as in other respects, had incurred the ill-will of the lawless and disorderly element of the city, while his personal traits of character, together with his diligence in suppressing lawlessness of all kinds, caused him to be held in high esteem by the good people of the place, who were greatly shocked by his death and especially the manner of it.

The indictment was found at a special term of the Barren Circuit Court held early in October, and the case was set down for trial at this term. But, on the motion of the defendants, the case was continued and did not go to trial until November.

When the case was called for trial in October the defendants made an application for change of venue, which was overruled, and this ruling of the court is the first error assigned for reversal.

On the hearing of this motion the defendants introduced seven witnesses, not including the two persons who had made the statutory affidavit, and the Commonwealth introduced thirty-six. The witnesses on behalf of the Commonwealth were representative citizens from different parts of the county of Barren, and they united in expressing the opinion that the defendants could have a fair trial in that county.

On the other hand, the witnesses for the defendants expressed the opinion that a fair trial could not be had in Barren County. The weight of this evidence shows that aside from the fact that the defendants were charged with and were perhaps generally believed to have killed Thurman, there was no cause for any widespread feeling of hostility toward them on the part of the citizens and people of the county. Both of them had lived in the city of Glasgow for many years, Mansfield pursuing his trade as a blacksmith and Pace as a printer, while Thurman had been in Glasgow but a few months, and was not very well known outside of the city. So that there was no reason except this charge why the sentiment in the large county of Barren should be so generally hostile to the defendants as that a jury free from prejudice against them could not be selected, and this charge did not, as we think, affect the body of the people to such an extent as to prevent a fair trial.

The defendants also introduced on this motion a copy of the Glasgow Republican, a weekly paper published in Glasgow, issued on September 24th, a few days after Thurman's death, and a copy of the Glasgow Times, also a weekly paper published at Glasgow, issued on September 22nd. In both of these papers there appeared editorial comments praising Thurman as a man and officer, and denouncing in strong terms the persons who killed him.

The articles in these papers, while emphasizing the pressing necessity for a speedy trial and quick punishment, if the accused were found guilty, did not charge them with guilt. Their purpose was to arouse the people to the importance of having a strict enforcement of the law.

These vigorous articles doubtless gave voice at the time to the indignant and alarmed condition of the law-abiding people of Glasgow concerning this crime, and it was entirely reasonable and proper that these papers should, under the circumstances, have given expression to their views touching the murder that had been committed on the streets of the city in which they were published. But we do not think the publications exercised upon the people of the county so great an influence or created such a sentiment of hostility against the defendants as that they could not obtain a fair trial in the county.

It is the right as well as the duty of well conducted newspapers to condemn lawlessness and disorder, to demand a strict enforcement of the law, and to insist that justice, without unnecessary delay, shall be administered. And we think it is true that when a grave crime has been committed, there are few newspapers published in the place where it occurred that do not give expression to the sentiments we have noticed.

But this privilege, so freely exercised by the press, is not of itself cause for the removal of a prosecution, although newspaper comments are admissible as evidence on the motion. There must be other and independent testimony that the condition of public sentiment in the county is such that the accused cannot have a fair trial.

In this instance the trial did not take place for more than a month after these two publications appeared, and if newspaper articles like these furnished sufficient grounds for a change of venue, few trials could be had in the county where the crime was committed, if the accused desired to remove the prosecution.

Every person accused of crime is, of course, entitled to a fair trial by a jury that is free from partiality or prejudice, but in matters involving motions for a change of venue, this court has always strongly relied on the good judgment and discretion of the trial court, and has rarely interfered with its ruling on these applications. The circuit judge is one of the chief judicial officers of the State, it being his highest duty to administer the laws of the State so as to secure both to the Commonwealth and the accused a fair trial, and when he has denied the motion, the presumption is that his ruling was

influenced solely by his honest conviction that the defendant could have a fair trial in the county.

The judge who presided when this motion for a change of venue was heard had long been the circuit judge in Barren County, and was, as we may well assume, acquainted with the people and public sentiment of the county. After hearing the witnesses introduced in behalf of both parties, his conclusion was that the defendants could have a fair trial in Barren County, and in this conclusion, after carefully reading the record, we concur. Combs v. Com., 160 Ky., 386; Stroud v. Com., 160 Ky., 503.

It is also urged that error was committed in permitting witnesses to testify that a hammerless, No. 38, Smith & Wesson pistol could not be discharged by striking the handle against an object, or unless the safety device was pressed and the trigger pulled simultaneously.

The competency of this evidence comes up in this way: The pistol with which Mansfield was shot was thrown away at the time by Pace—so he testified—and never found, and, consequently, it could not be produced on the trial. Nor was there any direct evidence that Thurman had, at the time he was killed, a hammerless Smith & Wesson No. 38 pistol. When he was leaving the hotel in response to the call to go to the place where Pace was arrested a witness saw a pistol in his pocket as he passed out of the hotel, but could not certainly identify it as a hammerless Smith & Wesson No. 38 pistol. On the trial of the case a hammerless Smith & Wesson No. 38 pistol was used in the presence of the jury for the purpose of demonstrating to the jury that this character of pistol could not be discharged by striking the handle or butt against any object or person, and could only be discharged by pulling the trigger and at the same time pressing the safety devise. These witnesses also testified that all Smith & Wesson hammerless pistols were of the same type and mechanism in this respect.

This evidence for the Commonwealth was objected to on the ground that it was not shown that Thurman, at the time he was killed, had in his possession a hammerless No. 38 Smith & Wesson pistol, and this being so, it was prejudicial error to permit the evidence and experiments we have indicated to go to the jury. This evidence, experimental and otherwise, was material for

the Commonwealth and prejudicial to the accused, and so it was necessary that the Commonwealth should, by direct or circumstantial evidence, show that Thurman, when killed, had the same type of pistol that was used in making the experiments before the jury.

We have read carefully the record on this subject, and our opinion is that the identity of the pistol Thurman had was sufficiently established by circumstantial evidence to permit the evidence to be given and the experiments to be made. It was shown that he used only two pistols, a large pistol called a "45" and a Smith & Wesson hammerless No. 38; that he had a pistol in his pocket when he left the hotel, where he boarded, to go to where Pace was arrested, and that it was not the "45." In the absence of the pistol itself, this was the best evidence that could be produced by the Commonwealth, and it was, we think, sufficient to authorize the admission of the experiments that were made and the evidence relating thereto.

In the cases of Parrott v. Com., 20 Ky. L. R., 761, and Ireland v. Com., 22 Ky. L. R., 478, relied on by counsel for appellant, the court ruled that the instruments used as evidence before the jury were not admissible because there was no evidence of any kind sufficient to show that the accused used, in committing the crime with which he was charged, the instruments admitted in evidence. In those cases the Commonwealth introduced what it claimed to be the identical instruments used, but failed to identify them, and for this reason the evidence was held incompetent and prejudicial.

On the motion for a new trial it was shown by evidence and affidavits in behalf of the appellant that John Earl, one of the jurors, had said before the trial that "Mansfield and Pace ought to be hung, and that if he was on the jury he would hang them, and that he would be one of a mob to hang them." Earl, the juror, was examined in open court and denied in the most emphatic way that he had ever made any of the statements attributed to him in the affidavits or evidence. He further said that he was not acquainted with Thurman or any of his family; that he had never seen Mansfield until he was summoned on the jury, and was not acquainted with Pace; that he was not related to either, or to any of the family of Mansfield or Thurman; that

he had no opinion and had expressed no opinion prior to the time the case was submitted to the jury.

Other witnesses were introduced for the Commonwealth, who gave evidence tending to support the evidence of Earl, that he had not, at the times or places specified by the witnesses for the appellant, expressed the opinions attributed to him by these witnesses.

Of course, if this juror did express himself in the manner stated, he ought not to have sat upon the jury, and we have no doubt that if the trial court believed from the evidence that the juror had made these statements, he would have set aside the verdict and granted the defendant a new trial. But in disposing of questions like this the ruling of the trial court is entitled to great weight, especially when the matter has been so thoroughly inquired into as in this case. The evidence that would justify the trial court in setting aside a verdict on the ground that one of the jurors had expressed opinions that would disqualify him from sitting in the case if they had been known, should be very clear and convincing, when first brought to the attention of the court after the verdict. If new trials could readily be secured after the verdict on grounds like these, the temptation to procure the needed evidence and the ease with which it could be procured, would result in many new trials being granted on this ground when the verdict should not be disturbed.

It appears from the record that the trial judge investigated this matter very carefully, hearing orally the evidence of a number of witnesses and also affidavits introduced by both parties. Upon thus hearing and considering it, he declined, and, as we think correctly, to grant a new trial on this ground. Brannon v. Com., 162 Ky., 353.

Another ground urged for reversal is that during the trial the jailer of the county arrested, for drunkenness, a son of one of the jurors, and, while he was under arrest, took the boy, at his request, to see his father, who was at the hotel with the other jurors in the custody of the sheriff, so that he might get his father to assist in securing his release. The record shows, without contradiction, that the boy talked with his father in the presence of the other jurors and in the presence and hearing of the sheriff who had charge of the jury, and that there was nothing said in the conversation having any sort of

connection with the case on trial. We find nothing in this incident that would support a charge of misconduct on the part of the sheriff or any of the jury.

It is further complained that the sheriff, on three different nights during the trial, took the jury to a moving picture show. But the record shows, without contradiction, that the place where the moving picture show was exhibited was not crowded; that the jury sat on the front seats, while the sheriff occupied a seat nearby from which he could and did see what the jurors did, and that no one approached any of them nor was any conversation relating to the trial had in their presence. We do not find in this circumstance any misconduct on the part of the officer or jury.

Upon the whole case, our opinion is that the appellant had a fair trial, and the judgment is affirmed.