# Holmes v. Commonwealth.

(Decided December 18, 1931.)

574

J. E. WISE, HAYNES CARTER, and FRANK HANDLEY for appellant.

J. W. CAMMACK, Attorney General; J. M. GILBERT, Assistant Attorney General; ALLEN P. CUBBAGE, Commonwealth Attorney; C. E. MORGAN, County Attorney; and J. R. LAYMAN for appellee.

OPINION OF THE COURT BY CREAL, COMMISSIONER—Affirming.

On April 20, 1931, the first day of a special term of the Hardin circuit court, Walter Holmes, alias Jack Strong, Charles Rodgers, and Walter Dewberry, all negroes, were jointly indicted for the murder of Thomas Tillery. Separate trials of the defendants at the same term resulted in judgments of conviction carrying a death penalty. They have prosecuted appeals. As much of the record in two cases is the same, the appeals of Walter Holmes and his codefendant Charles Rodgers were heard together. Owing to some difference in facts and circumstances attending the trial, their appeals will be disposed of in separate opinions.

The questions argued and relied upon by counsel for reversal of the lower court's judgment call for an extended statement of the case.

The home of Thomas Tillery is situated in Hardin county near the boundary line between that county and Larue. The residence is about 100 yards from state highway No. 61, and a portion of the yard surrounding the home abuts the right of way of the Hodgenville & Elizabethtown Railroad.

About 1 o'clock on the morning of April 8, 1931, appellant and his codefendants went to the Tillery home and first knocked at the front door. Failing to receive a response, they went around to a side porch, where Holmes knocked on a door leading into a room to the side and rear of a bedroom occupied by Mr. and Mrs. Tillery. A window to this bedroom opens on the side porch. Mr. and Mrs. Tillery were both awakened, and he went to this window and pulled aside the curtain to look out. He then raised the window a few inches and asked these negroes what they wanted. They told him they wanted to borrow an automobile pump. He stated that he did not care to lend them the pump as he did not know them. They then offered to leave money with him until they

returned the pump, but he again refused to comply with their request. Thereupon Holmes kicked the glass out of the lower sash of the window and entered the room. He was followed by Rodgers. Immediately after the window was kicked in, a shot was fired, and, following this, a terrific struggle ensued between Mr. Tillery and the two negroes. Before this struggle began, Mrs. Tillery sought safety under the bed, where she remained until her husband and his antagonists had left the room. Some time during the struggle another shot was fired in the room and two or three shots were fired on the outside. One of the shots fired on the outside entered the ceiling on the side porch and one went through the wall of the bedroom near the front corner of the house.

Mrs. Tillery testified that after the first shot was fired her husband screamed and groaned as though in agony. The condition of the furniture, the floor, and the walls of the room bore evidence of the determined struggle in which Mr. Tillery and his assailants engaged. The fight continued out into the yard and through the gate or over the fence to the railroad track, where appellant and his associates finally left their victim beaten and mortally wounded.

It appears from the evidence, however, that the attack on Mr. Tillery was not abandoned until W. T. Wright, his son-in-law, who was asleep in the bedroom across the hall from that occupied by the Tillerys had been aroused and had gone out to the front of the house, where he fired a shotgun. During the struggle, Mr. Tillery was continually calling to his son-in-law to come to his aid. Mr. Wright did not hear the struggle going on in the room, but heard the firing on the outside, and even then did not realize that his father-in-law was being assaulted.

Mr. Wright testified that when he was awakened he immediately ran to the front door and learned that the shooting was in the yard and that a fight was in progress. He then procured a shotgun and went out into the yard. He heard a pistol snap twelve or fifteen times and also heard a lick, and following that a man cried, "Shorty come to me, they are killing me" (Shorty being a name by which Mr. Wright was known to his family and friends). Mr. Wright then fired two shots, following which he saw one man pass around the end of the cattle guard of the railroad track. He went into the house and left his gun, but returned immediately to the yard, when

he heard one man running through the barn lot and two running down the highway. He then assisted Mr. Tillery back into the house and put him on the bed.

Mrs. Tillery testified that after her husband got back into the room and on the bed he stated that he could not get well, and later told Dr. English, who had been called to treat him, that

"There was no need to send him to the hospital, that he could not get well and he thereafter stated that he was shot in the room and that there were two negroes in there."

An ambulance was called from Elizabethtown, and Mr. Tillery was hurriedly conveyed to the Baptist Hospital in Louisville, where he arrived about 4 o'clock. Dr. Hart Hagan a surgeon, was called, and in an effort to save his patient's life performed an operation, which however, was to no avail, as Mr. Tillery died about 12:10 the following afternoon.

Ben Perry, who drove the ambulance, and Noble Perry, a neighbor and friend, who accompanied Mr. Tillery to the hospital, testified as to statements made by him when they told him the surgeon had decided to operate. Ben Perry testified that he went to the room and told Mr. Tillery the doctor had decided to operate in a few minutes, and the latter said: "I would a whole lot rather he would give me something to ease me. I am not going to live very long. I will be dead in a little bit." On being asked how many men were in the room, he replied, "There were two men together in the room, . . . and they dragged me through the window." He was then asked, "How many were on the outside?" He replied, "There were three that beat me up on the railroad." On cross-examination this witness was asked if Dr. Hagan indicated how long he expected Mr. Tillery to live, and replied, "No, he said he could not live but a short time the way he was suffering."

Noble Perry stated that, when informed that an operation would be performed, Mr. Tillery said, "An operation would do no good and that he would rather they would give him something to ease him as he would not be there very long." Mr. Tillery further stated that "he was in the house and the first shot hit him—that he was shot and that there was two negroes come in the room through the window and dragged him out to the railroad

track and that there was another negro outside and the three of them got over there across the railroad track and that those three were beating him out there.''

The commonwealth introduced in evidence the following typewritten statement, which was signed by appellant in the presence of Elmer Smith, a notary public, and a number of police officers:

"I have known this man called Walter Dewberry by the name of Walter and Charlie Rodgers under the name of Charlie about a month and a half, and I met them both in Chicago. I never did go under the name of Jack Strong and they both knew me by the name of Walter Holmes. The first holdup job we ever pulled together was last Monday night in Chicago, Ill. We went into a house there and held up two women and three or four men and took some automobile keys off of one of the men for a Ford sedan which he had parked in front of the house and we three got in it and drove away. We came thru Indiana and went in one house and held them up and we did not get anything as they said they were poor people and did not have anything.

"We arrived in Louisville Tuesday morning April 7th and slept all that day and that night we three got into the automobile and drove up to some man's house here in Louisville and rang the door bell and when the man come to the door we all stuck pistols on him and backed him to the house and we tied him and his wife up and two or three children that were in there, and I got two or three dollars out of the man's pocket.

"Then we drove down the Dixie Highway and held up three or four different places in about the same way and got some money from each of them and we would also tie them up like we did these other jobs. Then we drove into some small town and some men tried to head us off and we turned into a street to the left and this was a blind street and the three of us had to jump out of the car and leave it.

"We down across some fields some distance until we came to a house and I went up to the door and knocked on it and some man answered it from inside and I told him I wanted to borrow a tire pump that I had had a puncture. My idea was to get this man to come to the door and open it so we could hold

him up and get the keys for his car so we could make our getaway in it. He did not come and open the door so I kicked the window in next to the door and I went in first and the other two followed me in and I went around the corner into the next room and I hollered stick 'em up and I made one shot and this white man was hitting some thing up against the wall, and these other two colored boys were in the same room that the white man was in and I heard two more shots fired and these other two boys backed out thru the window and this white man went out behind them, and he was out in the yard hollering for help to somebody upstairs who asked him what was the matter and he told him robbers to get his gun and come down. When he said that I unlocked the door and stepped out on the porch and went around to the back of the house, and this white man was standing in the yard, and there was some more shots fired and as I was going out across the field there was some more shots fired and the white man was still hollering. I only fired one shot during the whole time. And I still had my pistol when I was arrested and I had taken the empty cartridge out and had put a loaded one in its place.

"I have read this statement before I signed it, and have made same without any threats or promises from anyone and it is true."

Holmes testified that he was coerced into signing this statement, but the evidence of police officers and also Mr. Morgan, county attorney of Hardin county, is to the effect that Holmes was in no way threatened or coerced, but, on the other hand, that his statement was made freely and voluntarily and that he knew and understood the contents of the writing before he signed it.

Appellant and Walter Dewberry, who was introduced as a witness in his behalf, admitted that they went to the home of Mr. Tillery and asked to borrow a pump, but that this was merely a ruse, and their real purpose was to take from Mr. Tillery the key to his garage, and their ultimate purpose was to take this automobile. Appellant admitted that he entered the room followed by Rodgers and that he fired the shot for the purpose of frightening Mr. Tillery and commanded him "to stick 'em up." Holmes testified that he did not shoot in the direction of Mr. Tillery. He stated that when he

fired the shot Mr. Tillery was hitting him with something, but that, when Mr. Tillery discovered one of the other negroes coming in at the window, he attacked and forced the latter to retreat and followed him into the yard. He further stated that, when Mr. Tillery left the room, he (appellant) unlocked the door and left the scene, seeing nothing more of his associates or of Mr. Tillery.

Dewberry testified that Holmes and Rodgers went in through the window, but that he stayed on the outside, and, after he heard the shots in the house, went back toward the cow gate; that when he got there Mr. Tillery came out through the window. He stated that he saw nothing more of Holmes after he went in the window, but that Rodgers came out ahead of Mr. Tillery and went out on the highway. He further testified that when Mr. Tillery came out of the house he had a stick in his hand which he was using as a weapon; that Mr. Tillery started toward him and he began firing. When asked what Mr. Tillery was doing at the time, he said, "He wasn't doing anything—He was groaning at the time—At first I thought it was crying—I don't know whether he was crying—he was in pain, I suppose the reason was he was hollering." He further testified that he got hold of the stick which Mr. Tillery had and that they were in a grapple until Mr. Tillery weakened to such an extent that he was able to get away. Altogether he fired five shots and after that snapped his pistol several times.

Rodgers and Dewberry were arrested on the day of the tragedy. Dewberry, who had suffered a sprained ankle and was unable to walk, was apprehended in Larue county something over a mile from the Tillery home between 8 and 9 o'clock the next morning. Rodgers was arrested later in the day at Munfordsville, and on the following day Holmes was arrested in Bowling Green. All the prisoners waived examining trial before the county judge of Hardin county, and as a precautionary measure were transferred to the Jefferson county jail for safe-keeping.

On April 20, after the indictment was returned, the defendants were brought back to Elizabethtown and their cases set for hearing on April 28. Counsel was appointed to defend them, and they were remanded to the jail of Jefferson county.

When appellant's case was called for trial, he entered a written motion for a change of venue and in

support thereof filed his own affidavit and the affidavit of the two attorneys who had been appointed to defend him. Attached to and made a part of these affidavits were a number of newspaper articles which had been published in the local newspapers and in daily papers published in the city of Louisville giving accounts of the killing of Mr. Tillery as well as accounts of other crimes committed by appellant and his codefendants, including outrages committed against white women at Hickman, Ky., and East St. Louis, Ill., and also accounts of a number of robberies committed by them on their way from Louisville to Elizabethtown on the night of the attack upon Mr. Tillery. In the affidavits it is made to appear that a high state of feeling and prejudice existed against all the defendants in Hardin county and that threats of mob violence were being made which would likely be carried into execution. It was further made to appear that during the progress of the Dewberry trial the negro lawyer who was defending him was set upon and assaulted by an angry crowd or mob in the public square, and that at the request of the circuit judge a number of national guardsmen had been detailed to preserve order and to protect the defendants from violence; that these with special deputies had been stationed around the courthouse and the jail and had accompanied the officers in conveying the prisoners to and from the jail; that following the assault on the negro lawyer some of the soldiers came into the court room, where they remained for some time.

In opposition to the motion for change of venue, the commonwealth attorney filed his own written statement, together with the affidavits of sixteen citizens residing in widely scattered sections of the county, including the sheriff, county attorney, superintendent of schools, county judge, county road engineer, one justice of the peace, the present representative in the General Assembly, and the associate editor of the Elizabethtown News. From the statement of the commonwealth attorney and affidavits of these citizens, it is made to appear that there was no such feeling of prejudice or bias against the defendants as would preclude them having a fair trial at the hands of a jury in Hardin county, and that there were no threats nor danger of mob violence. In one of these affidavits, it is stated that the affiant was requested to count the number of persons present in the court room while the motion for change of venue was being heard,

and that such count revealed the presence of 242 persons, exclusive of court officials, in a room which had a seating capacity of about 500. It is also made to appear in the record that the assault upon the negro attorney was not the concerted action of an angry crowd or mob, but was the action of some misguided individual or at least of a very few persons.

A number of witnesses who made affidavits were called and testified at length on the hearing of the motion. They testified that they had mixed and mingled with the crowd and made some inquiry, and although there were a large number of people in town, they found no evidence of threats or anything to indicate probable danger of mob violence.

It is insisted by the Attorney General and associate counsel that the application for change of venue should not be considered on appeal because it was not made in conformity with the requirements of the statute, and it cannot be said that this argument is without merit. Under section 11 of our Constitution relating to criminal cases, ''The general assembly may provide by a general law for a change of venue in such prosecutions for both the defendant and the Commonwealth,'' and the General Assembly has provided by general law for change of venue in such cases and has prescribed the method by which the right granted may be invoked and the limits within which it may be exercised.

Application of defendants in criminal cases for change of venue must be made by petition in writing with supporting affidavits in conformity with the provisions of section 1110, Ky. Statutes, and, in the absence of such petition and supporting affidavits, the court is without authority to grant to defendants a change of venue. Miller v. Commonwealth, 175 Ky. 241, 194 S. W. 320; Taylor v. Commonwealth, 240 Ky. 450, 42 S. W. (2d) 689, 692; Graham v. Commonwealth, 164 Ky. 317, 175 S. W. 981.

But, aside from any question of compliance with technical requirements of the statute, it does not appear from the record that the court erred in refusing appellant's application. The burden of proof is on the applicant to show sufficient grounds for change of venue, and this burden is met when he makes application in conformity with the requirements of the statute. The

court has no discretion in the matter, and must sustain the application unless the commonwealth offers proof in opposition to the motion. Neace v. Commonwealth, 233 Ky. 545, 26 S. W. (2d) 489; Combs v. Commonwealth, 160 Ky. 386, 169 S. W. 879; Hill v. Commonwealth, 232 Ky. 453, 23 S. W. (2d) 930.

But when, as in this instance, the commonwealth controverts the allegations and produces proof in opposition to the application and supporting affidavits, an issue is made. In such circumstances the granting or refusing the application is a matter addressed to the sound discretion of the trial court, and, under a well-established rule in this jurisdiction, its decision in the matter will not be disturbed unless it affirmatively appears that there has been an abuse of that discretion. Greer v. Commonwealth, 164 Ky. 396, 175 S. W. 665; Stroud v. Commonwealth, 160 Ky. 503, 169 S. W. 1021; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5; Vaughn v. Commonwealth, 204 Ky. 229, 263 S. W. 752.

In this case we may with propriety adopt and apply from the opinion in Heck v. Commonwealth, 163 Ky. 518, 174 S. W. 19, 20, the following:

"The right to a change of venue is only bestowed by the statute, and the Legislature has authority to provide for the extent and manner of its exercise. In the case at bar, evidence was heard upon the motion, and we presume all was heard that either party desired to offer. The judge of the trial court, in deciding upon such a motion, has a sound discretion, and has better opportunity of properly estimating the conditions which exist in the community where he is then engaged in holding court, a better acquaintance with the witnesses, and is able to know better what weight to give their evidence, than we can possibly know."

It does appear that Louisville dailies and the local newspapers gave wide publicity to this and other crimes committed by appellant and his associates. While newspaper articles are admissible and may be considered on a hearing of application for change of venue, there must be other evidence tending to show such a condition of public sentiment in the county as would prevent the applicant from having a fair and impartial trial. Mansfield v. Commonwealth, 163 Ky. 488, 174 S. W. 16, 18.

Naturally when a home is invaded and its occupants assaulted and slain with ruthless savagery by a band of armed men, public interest is aroused, and newspapers, seizing upon an opportunity to supply the demand of the reading public for details of the crime, carry articles similar to those complained of here. Louisville dailies carrying these articles are of wide circulation, and it would have been impossible to have removed this prosecution to a county where accounts of this crime and of the criminal record of accused and his associates had not been read. It is also natural that there was a prevailing sentiment in Hardin county against this crime and a demand that its perpetrators should be brought to justice. Such sentiments prevail among law-abiding citizens everywhere, and, if held grounds for change of venue, it would likewise be difficult, if not impossible, to find a county in which to try an offender.

As said in the case of Mansfield v. Commonwealth, supra:

"The judge, who presided when this motion for a change of venue was heard . . . was, as we may well assume, acquainted with the people and public sentiment of the county. After hearing the witnesses introduced in behalf of both parties, his conclusion was that the defendants could have a fair trial in (Hardin county), and in this conclusion, after carefully reading the record, we concur."

In support of his motion for a continuance, appellant, in addition to a reiteration of grounds stated in his motion for change of venue, stated that he had not been able to employ counsel and had been confined to the jail at Louisville without opportunity to confer with the attorneys appointed to defend him and prepare his case for trial. It is made to appear by affidavit of the county attorney in opposition to the motion for continuance that attorneys for appellant did confer with him at the jail in Louisville and that arrangements were made whereby funds were provided to pay the expenses that might be incurred by counsel at any time they desired to confer with appellant.

The Constitution gives to every one accused of crime the right to be represented by counsel, and this carries with it the right of the accused and his counsel to

have reasonable time and opportunity to make preparation for trial. McDaniel v. Commonwealth, 181 Ky. 766, 205 S. W. 915; Piercy v. Commonwealth, 195 Ky. 725, 244 S. W. 52.

Appellant and his codefendants admit practically everything charged and attempted to be proven by the commonwealth except that they disclaim having had any intention or purpose of killing Mr. Tillery. In view of their admissions and the failure to name any witnesses of whose evidence they were deprived, it is not apparent that delay would have been of any advantage to counsel in the preparation of his case. It is well settled that the trial court is vested with a reasonable discretion in granting or refusing continuance, and, in the absence of any showing of abuse of this discretion, this court is not authorized to interfere. Jamerson v. Commonwealth, 230 Ky. 704, 20 S. W. (2d) 711; Browder v. Commonwealth, 232 Ky. 205, 22 S. W. (2d) 615; Brandriff v. Commonwealth, 227 Ky. 389, 13 S. W. (2d) 273.

It is further urged as ground for reversal that the court erred in admission of evidence as to statements made by Mr. Tillery after he received his wounds. The evidence clearly indicates that Mr. Tillery died of the gunshot wound, and that it was in its nature necessarily fatal. While he was rushed to the hospital and an operation performed, there is no evidence that any hope of recovery was held out to him or that he ever entertained such hope; on the contrary, the evidence indicates that he fully realized the serious nature of his wounds and that the end was rapidly approaching.

After proper preliminary foundation has been laid, the statements of a wounded person are competent and admissible. For a full discussion as to the competency of such evidence and the theory upon which it is admitted, see Whitehead v. Commonwealth, 200 Ky. 440, 255 S. W. 93, and long list of authorities therein cited.

It is further insisted that the court erred in admitting in evidence the written statement signed by appellant, and especially so much thereof as relates to other offenses committed by him and his codefendants prior to an attack upon Mr. Tillery. There is a general and well-recognized rule that, in the trial of criminal cases, evidence as to the offenses other than that for which defendant is being tried should not be admitted, but there are equally well-established exceptions to this general rule. In the recent case of Sneed v. Common-

wealth, 236 Ky. 838, 34 S. W. (2d) 724, this court, after stating the general rule and the exceptions thereto, sets forth that evidence relating to other offenses may be admitted to establish "(1) identity; (2) motive; (3) intent; (4) guilty knowledge; (5) a plan, system, or scheme of perpetrating crime; (6) to cover up previous crime or the evidence of a crime for which he is at the time being tried; (7) or a crime, the proof of which is so interwoven as to be inseparable from the crime for which he is being tried, that the evidence of the two acts cannot be separated." Clearly the evidence complained of comes within one or more of the enumerated exceptions, and, in view of the admonition given to the jury by the court as to the purpose for which this evidence was admitted and was to be received and considered by them, its admission was proper.

Counsel for appellant make further argument that the court erred in not instructing the jury to find appellant not guilty if they believed from the evidence that he had abandoned the purpose for which he went to the home of Mr. Tillery and had left the scene before the fatal shot was fired. This contention is wholly without merit, as there is no evidence to warrant such an instruction. According to his own evidence, appellant and his two confederates went to this home with an agreed purpose to rob its owner of his keys and automobile, and, in furtherance of that agreement and with concert of action, the home was broken into and a deadly assault was made upon Mr. Tillery. There is ample evidence to show that Mr. Tillery was shot before he left the room and that appellant continued the assault down onto the railroad track. Appellant cannot escape the ultimate consequences of his own acts because he left to hands no less cruel than his own the task of completing his own pitiless and murderous assault.

In the case of State v. Forsha, 190 Mo. 296, 88 S. W. 746, 757, 4 L. R. A. (N. S.) 576, cited in brief for the commonwealth, the court disposed of a similar contention in the following language:

"We are unwilling to sanction as the law of this state that a defendant can first, by words and actions, put in operation a difficulty, or aid and abet in the commencement of it, and, after having by his course of conduct brought the principal actors into a deadly contest, that he can then flee from the scene

of the struggle and thereby relieve himself absolutely from the results of such fatal difficulty. Such is not the law of this state, and the court very properly refused the instructions requested upon that subject.''

We approve and adopt the language of the Missouri court as expressive of our views of the question presented here.

It is finally urged that the substantial rights of appellant were prejudiced by improper argument made by attorneys for the commonwealth before the jury. Judge Layman, who was employed to assist in the prosecution made the following statement:

"The court permitted evidence in this case of acts occurring at various places in order to show you motive and admonished you that it was competent to show motive, purpose and intent, and to show the identity of this defendant, that they had entered houses, sticking together and going on through in the things they were doing."

As hereinbefore indicated, the trial court properly admitted the evidence referred to for the purpose indicated in the admonition given to the jury; therefore the argument was not improper.

In the closing argument, the commonwealth attorney said:

"If this defendant is not given the death penalty he just ought to be acquitted. Why do I say that? I say that because life imprisonment is not life imprisonment as those that are sent to the penitentiary for life—when people are sent to the penitentiary for life in this state, they do not ordinarily remain there for life; they are paroled in a few years."

This and similar statements have so often come under the condemnation of this court, it is to be wondered that the attorneys for the commonwealth do not refrain from making them. However, our attention has not been called to any case holding that such statements, standing alone, will constitute reversible error except the case of Berry v. Com., 227 Ky. 528, 13 S. W. (2d) 521, where it was so held under the peculiar facts therein. The cases of Chappell v. Commonwealth, 200 Ky. 429, 255 S. W. 90, and Postell v. Commonwealth, 174 Ky. 272, 192

S. W. 39, in which similar arguments were criticized and condemned, were not reversed because of the improper argument. There are numerous cases which give recognition to the impropriety of such argument yet hold that it does not constitute such prejudicial error as will warrant a reversal. Bolin v. Commonwealth, 206 Ky. 608, 268 S. W. 306; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5; Moore v. Commonwealth, 223 Ky. 128, 3 S. W. (2d) 190.

It is gratifying that the machinery of the law was set in motion in such prompt and orderly fashion following the commission of this crime. The trial judge and other officials of the court are to be commended for the orderly way in which the trial was conducted. Over one hundred pages of the record consist of the examination of prospective jurors, and we have been impressed with the candor and intelligence displayed by talesmen in answering questions propounded to them as well as with the care displayed by the court and attorneys for the prosecution to see that no one was accepted as a juror who entertained the least prejudice or bias or had any opinion as to the guilt or innocence of the accused.

Appellant was represented by able counsel appointed by the court, and be it said to their credit that they faithfully and efficiently discharged their duty to him, both in the lower court and on this appeal.

The unfortunate position of appellant is not due to any violation or refusal of the rights guaranteed him by law, but is due to his own disregard and violation of the laws of the land and of the most sacred rights of others.

Finding no error in the record prejudicial to appellant's substantial rights, the lower court's judgment is affirmed.

Whole court sitting.