## Lotheridge v. Commonwealth.

(Decided Oct. 1, 1935.)

JAMES H. NEWMAN and WM. G. REED for appellant.

BAILEY P. WOOTTON, Attorney General, and H. HAMILTON RICE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Affirming.

On the night of December 5, 1931, Theodore Fitchen was mortally wounded, while on the public highway near the corporate limits of Carrollton, Carroll county, Ky. At the point where he was discovered, his automobile was parked and burning. He was found lying opposite a ditch on the right-hand side of the highway within a few feet of the automobile, in an unconscious condition. "He had fourteen lacerations of the skull. A fracture of the frontal bone and a fracture of the occipital bone;" his back, left side, arms, and head were severely burned. "There were no burns on his hands; to the muscles and flesh of his hands," which the physician testified showed "that Fitchen was unconscious when the gasoline was poured on him and set on fire, because he would have fought it." "He had wounds all over his head." "Fourteen of the wounds were of such a nature as to produce death;" "any one of the fourteen could have caused his death." His clothing, including his hat, evidenced the presence of gasoline. He had bled profusely, and his clothing was saturated with blood. An automobile crank and jack were near his body with flesh, blood, and hair on them. "A blackjack" in like condition was found a short distance away. After remaining in the doctor's office a few hours, Fitchen was carried to St. Anthony's Hospital, Louisville, Ky., where he died in a short time.

At the time he was found there was a pool of blood in front of the car; another, not quite so large, on the opposite side of the road, and about 10 or 12 feet away, were spots of blood.

Fitchen was unmarried and operated a "pressing club" on Main street near the Gulf Filling Station and the Richland Hotel in Carrollton. He was in the habit

of carrying money on his person, "and could always make change for anyone." This was his reputation.

Mrs. Hugh Arvin resided in a building by the side of Fitchen's place of business, about a half a square from the Richland Hotel. About 20 minutes of 11 o'clock that night she saw Fitchen on the south side of Main street; he went to the back of "his building," backed his car out into the street, and "turned toward the hotel," traveled in his car, "straight down Main Street in the direction of Mr. Johnson's."

Harold Carlisle, who resided at Carrollton, on that Saturday night, while putting his car in a garage, heard a noise, "like somebody beating on something;" "saw a light following an explosion." He reported to Mrs. Charles Scott Pearce and Jack Daugherty what he had seen and heard; the three got in the car of Daugherty and went to the point at which was the light, where they found a car burning. The intense heat prevented them from approaching the car near enough to discover the actual situation and whether any one was present. They returned to town and informed the fire department of the burning car. They, with the firemen, returned to the burning car, where Fitchen was discovered at the point and in the condition above described.

On Sunday morning following the fire, the black-jack was found, also a piece of lining of an overcoat, in a field near where the tragedy occurred. The black-jack was identified by a boy as one he had sold to Eulie Lotheridge. The latter boarded and roomed at the home of Mr. and Mrs. Otis Crafton. The city officers, with the consent of Mrs. Crafton, searched the room occupied by Lotheridge, where they found an overcoat with blood in one pocket, and from the lining of which had been torn and a piece of it was gone. Comparing the piece of lining found near where Fitchen was killed, with the overcoat, they discovered the piece and torn lining corresponded.

On the morning before Fitchen was killed, Lotheridge endeavored to borrow a dime and to pawn a ring. When Fitchen was found, the pockets of his clothing were turned "wrong side out," and empty. The circumstances described above induced the arresting officers to arrest Lotheridge for the commission of the crime of killing Fitchen. His arrest was accomplished

on the day following the killing. On that day he made a confession in the presence of J. L. Donaldson and others. It was reduced to writing, and read to, and signed by, Lotheridge. In substance, he stated that on Friday afternoon before the killing on Saturday, Hunt suggested "that they bump someone off for money"; that he had had but little work during the past week and needed money and he agreed to go in with Hunt. And on Saturday night he met Hunt in Carrollton and they agreed that Fitchen had plenty money and would have on him the money he had collected during the week for cleaning clothes. They agreed to "bump off" Fitchen; that they would get a quart of whisky, get him to drive out with them in the car and accomplish their purpose, and that they did this by Hunt starting a fight, and as Hunt took from Fitchen a jack, he (Lotheridge) ran away; "that Hunt killed Fitchen and that there was another man present at the time, but he did not know who he was." Later Lotheridge made a second confession in the presence of Judge Hardin. In the latter confession, he described a fight between himself and Fitchen at the place the car was burned and Fitchen found. He described the number of licks he struck Fitchen and those made by Fitchen upon him. He closed the fight in this language:

"I then took the jack handle away from him and began to look in the car for the key, and while looking in the car for the key, he [Fitchen] got up again and came back at me. I then hit him with the jack handle and he fell again. I then looked again for the key, but could not find it in the car. I then felt in his overcoat pocket for the key, and then in his dress pocket, and found $14.00 in cash in his pocket in a leather pouch which had a draw string in the top which I took and put in my pocket. * * * I could not find a key to fit and while thus engaged, he [Fitchen] got up and came over to the car and fell in the car and said 'God Damn You, I'll get you,' and I then hit him with my fist and he sunk down on the floor of the car with his face and stomach on the floor and his legs out on the ground. I then lit another cigarette and threw the match down in the car and ran down in the field toward the Kentucky River and came back through the river bottom to Carrollton. * * * No one except

myself had any part in this affair and no one is responsible for anything that was done except myself.''

He claimed that he had thrown away the money which he had taken out of Fitchen's pocket, and that which was on his person when arrested had been earned by his work for a construction company and others. He also explained the presence of the blood in his overcoat pocket by saying the palm of his hand was injured in the fight with Fitchen. •

On a trial to a jury, Lotheridge was convicted of willful murder, and his punishment fixed at death. As grounds for reversal, he is insisting the court erred in overruling the objection to the introduction of his overcoat, which was "procured from his room without a search warrant,'' in his absence; in permitting John Daugherty, a witness for the commonwealth to testify that at the time Fitchen was carried to the office of a physician, "when they lifted him out of the car, the flesh slipped away from his bones, at least it felt that way." The chief of police, when on the witness stand, was asked, on cross-examination, if there was evidence of a struggle at the scene of the tragedy. The court sustained an objection to the question and refused to permit the witness to answer it. The instructions given to the jury are the usual instructions given in such case. Instruction No. 1 directed the jury, if it found Lotheridge guilty of willful murder, to "fix his punishment in the penitentiary for life, or at death." This phrase is not followed by the words "in your discretion."

Lotheridge testified that at the time he made the confession in the presence of Donaldson and others, he was under the influence of intoxicating liquor to such an extent that he had no memory of making the confession or signing it. Other witnesses in his behalf testified that at the time of making and signing it, Lotheridge "was drunk." Donaldson and others who were present denied he was drunk; admitted he was drinking, but declared he was thoroughly at himself.

After seven jurors had qualified, a juror, during his examination, expressed himself as being opposed to capital punishment. He was excused by the court for that reason. Mr. Green, an attorney assisting in the prosecution, in the presence of the seven jurors, re-

marked, "I reckon if someone would cut his brother's heart out, he would say 'thank you.'" Lotheridge moved to discharge the panel as composed of seven jurors. His motion was overruled. In his closing argument to the jury, Mr. Green used this language: "A life sentence means about ten or fifteen years, made possible on account of our Pardon Commission." Mr. Green further stated "He might be criticized as being employed as counsel, but he cared not for such criticism, that he had been retained by the family to assist the Commonwealth's Attorney and that nothing less than the death penalty would satisfy them."

The obligation is upon us to consider and dispose of these grounds of reversal in the light of the developed facts and the applicable principles of law, which we shall do in the order in which we have stated them.

Lotheridge admitted his participation in the crime charged and narrated facts which were abundantly overcome by the verbal testimony, the condition of Fitchen's body and the deadly wounds on it. Since it merely established his identity and participation in the commission of the crime, which he confessed and admitted, the introduction of his overcoat as evidence, even if it be conceded the possession of it was obtained improperly by the officers without first procuring a search warrant authorizing them to search the room occupied by him in the home of the Craftons, was immaterial, and a harmless error. To reach this conclusion, it is entirely unnecessary to consider and determine the legality or illegality of the search of his room in which the possession of his overcoat was obtained by the officers.

The question propounded by Lotheridge on the cross-examination of the chief of police obviously called for an expression of opinion of the witness whether there was "evidence of a struggle at the scene of the tragedy." It was competent for the witness to detail his observations of the condition of the ground at the scene of the tragedy, and it was the province of the jury to determine whether that which was described by the witness, evidenced "a struggle at the scene of the tragedy." The existing conditions appearing at the scene of the tragedy were elaborately described by a number of witnesses, and the opinion of the chief of police, as sought to be elicited by the cross-examination,

even if competent, was merely cumulative. Its exclusion by the court, in either event, was immaterial and harmless.

Instruction No. 1 appropriately defined the crime of murder, and apprised the jury of its duty, if it believed from the evidence beyond a reasonable doubt that the defendant was guilty of willful murder. It adequately informed the jury of its privilege to exercise its discretion in fixing his punishment at confinement in the penitentiary for life, or at death, without adding the words "in your discretion." It is apparent that the jury exercised its discretion when fixing the punishment, and did that which the words "in your discretion" import. Their inclusion in the instruction would merely emphasize that which the instruction, without them, naturally conveyed to the average mind. The failure to include these words in the instruction was likewise immaterial and harmless, even if it be conceded that they should have been added to it.

His insistence that the court should have admonished the jury concerning his claim that he was in an intoxicated condition at the time he made the confession, and signed a writing evidencing it, in the presence of Donaldson and others, is not sustained by any cited authority, or stated reasons. This confession is more favorable to him than that which he later made to, and in the presence of, Judge Hardin, in that in the former he asserted that Fitchen was killed by Hunt and not by him; whereas, in the latter, he declared no one was present but himself at the time Fitchen was mortally wounded. Concededly, whether Lotheridge at the time he made and signed the Donaldson confession, was or not in an intoxicated condition, affected not its competency, but merely the weight it should be given by the jury. Plainly, he was not prejudiced by the omission to give such instruction.

The statement of Mr. Green made at the time the eighth juror was excused because of the statement that he was opposed to capital punishment did not pertain to either the verbal or circumstantial evidence, or otherwise relate to the issue, of the guilt or innocence of the accused. At most, it was merely counsel's opinion of the attitude of the mind of the juror, as indicated by the statement. It is not conceivable that the seven

jurors who had qualified up to that time were influenced in the consideration of their verdict by the incautious remark of Mr. Green; nor is it entitled to the importance and weight ascribed to it in Lotheridge's brief. The other statements of counsel, quoted above, are like unto those which we have often classed as improper, but immaterial and not prejudicial.

In Tiernay v. Commonwealth, 241 Ky. 201, 43 S. W. (2d) 661, 663, in discussing materially prejudicial statements and arguments of counsel in such case, a number of our previous opinions were reviewed. Our conclusion is thus written:

> "Whether the error thereby committed would or not be sufficiently prejudicial in all cases to authorize a reversal of a conviction would necessarily depend upon the particular facts of the case; i. e., whether the error in the light of the proven facts was calculated to produce such a prejudicial effect on the verdict of the jury as to entitle the convicted defendant to a new trial, or whether, under the facts, the argument, though improper, could not possibly produce such a prejudicial effect and was therefore immaterial."

In Glenday v. Commonwealth, 255 Ky. 313, 74 S. W. (2d) 332, 334, the statement in the Tiernay Case is quoted, followed by a review of Holmes v. Commonwealth, 241 Ky. 573, 44 S. W. (2d) 592. In the Glenday Case, we said:

> "Our attention has not been called to any case holding that such statements, standing alone, will constitute reversible error except the case of Berry v. Commonwealth, 227 Ky. 528, 13 S. W. [2d] 521, where it was so held under the peculiar facts therein. * * * There are numerous cases which give recognition to the impropriety of such argument yet hold that it does not constitute such prejudicial error as will warrant a reversal. * * * We are inclined to the conclusion that possibly greater effect has been given to such remarks, in some of the cases, than what the appellant was entitled to. We are constrained to make that statement in the light of present conditions with reference to law observance. Those conditions are, that gangsterism, highway robbery, bank hold-ups, and other felon-

508

ious depredations have become expert professions by a large element of the lawless members of society, and because of which life has become cheap and security of ownership in property grievously impaired. Such conditions can be rectified only by a firm determination on the part of those intrusted with the enforcement of the criminal law to see to it that those who have been clearly proven to be guilty shall receive their just reward, and to not allow any technical error that does not clearly show prejudicial effect to interfere therewith. We therefore conclude that this ground is without merit.''

It is our conviction that the statements and argument of counsel of the commonwealth of which Lotheridge complains are within the rule as it is stated in the Glenday Case.

Reviewing and considering the grounds of reversal presented and argued by Lotheridge, they are, singly and collectively, insufficient to authorize the interruption of the verdict of the jury.

Viewing the verdict in the light of the proven facts and circumstances, excluding his confession to Donaldson, it is plain that he admits the commission of the crime for which he stands convicted, with a narration of his actions, perhaps satisfactory to himself, but neither exculpatory, mitigative, nor a justification of the atrocity of the crime. He was awarded by the court and the jury a fair and impartial trial, and, indubitably, the evidence authorizes and sustains the verdict of the jury.

Perceiving no error prejudicial to his substantial rights, the judgment is affirmed.

The whole court sitting.